Loran W. ROBBINS, et al.,
Plaintiffs/Counterdefendants,

v.

The PEPSI–COLA METROPOLITAN BOTTLING COMPANY, et al.,
Defendants/Counterclaimants,

and

Frito-Lay, Inc., et al., Additional Counterclaimants,

and

Central States, Southeast and Southwest Areas Pension Fund, et al.,
Additional Counterclaim Defendant.

CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND, et al., Plaintiffs/Counterclaim Defendants,

v.

PEPSICO, INC., et al.,
Defendants/Counterclaimants,

and

Pepsi-Cola Bottling Company of Los Angeles; Taco Bell Corp.; Pizza Hut, Inc.; and North American Van Lines, Inc., Additional Counterclaimants.

Nos. 84C170, 85C9385.

United States District Court,
N.D. Illinois, E.D.

May 8, 1986.

Neil K. Quinn, Joseph B. Lederleitner, Mary Anne H. Capron, Richard M. Waris, Pretzel & Stouffer, Chartered, Thomas C. Nyhan, Alan M. Levy, John E. Bardgett, Daniel M. Locallo, Chicago, Ill., Rodney F. Page, Michael Evan Jaffe, Ronald L. Castle, James J. Armbruster, Arent, Fox, Kintner, Plotkin & Kahn, Washington, D.C., James L. Coghlan, Coghlan & Joyce, Chicago, Ill., for plaintiffs.

Arthur S. Friedman, Peter N. Wang, Deborah Fabricant, Friedman, Wang, Bleiberg & Heimer, P.C., New York City, Stanley J. Adelman, Rudnick & Wolfe, Chicago, Ill., for defendants/counterclaimants.

John R. Climaco, John A. Peca, Jr., Thomas L. Colaluca, John M. Masters, Climaco, Climaco, Seminatore & Lefkowitz Co., L.P.A., Cleveland, Ohio, Edward J. Calihan, Jr., Anna Lavin, Calihan & Lavin, Chicago, Ill., for third-party defendants.

Henry Rose, Mitchell L. Strickler, Washington, D.C. Gen. Counsel, Eileen M. Marutzky, Asst. U.S. Atty., Chicago, Ill., Local Counsel, for amicus curiae.

NORDBERG, District Judge.

These consolidated actions seek to recover withdrawal liability under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA"), as amended by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. § 1381 *et seq.* Plaintiff Central States, Southeast and Southwest Areas Pension Fund ("Central States") is a multiemployer plan as defined in 29 U.S.C. § 1002(37)(A). The plan's trustees are also plaintiffs. Defendants Pepsi-Cola Metropolitan Bottling Co. ("Pepsi-Cola"), Pepsico, Inc. ("Pepsico"), Frito-Lay, Inc. ("Frito-Lay") and Wilson Sporting Goods, Inc. ("Wilson") are alleged to be members of a "controlled group" (*See* 29 U.S.C. § 1301(b)(1)) who employed workers covered by the plan. Jurisdiction is based on 28 U.S.C. § 1331 and 29 U.S.C. § 1451(c).

The defendants have moved for partial summary judgment, challenging the constitutionality of the "controlled group" theory and withdrawal liability provisions of the MPPAA. The Fund has also moved for summary judgment, denying that the act is unconstitutional, and urging this court to order defendants to pay their withdrawal

liability assessments in accordance with the provisions of the MPPAA.[1]

## Background of ERISA and the MPPAA [2]

In 1974, after several years of study and debate, Congress enacted the Employment Retirement Income Security Act, 29 U.S.C. §§ 1001 *et seq.* One of the central purposes of the Act was to "prevent the great personal tragedy suffered by employees whose vested benefits are not paid when pension plans are terminated." *Nachman Corp. v. PBGC*, 446 U.S. 359, 374, 100 S.Ct. 1723, 1732, 64 L.Ed.2d 354 (1980). *See also PBGC v. R.A. Gray & Co.*, 467 U.S. 717, 719, 104 S.Ct. 2709, 2713, 81 L.Ed.2d 601 (1984). Through the passage of ERISA, Congress endeavored to insure that "if a worker has been promised a defined pension benefit upon retirement—and if he has fulfilled whatever conditions are required to obtain a vested benefit—he actually will receive it." *Nachman*, 446 U.S. at 375, 100 S.Ct. at 1733.

In order to effectuate this goal, Congress promulgated a complex statutory scheme regulating the operation of defined benefit pension plans.[3] Title IV of ERISA, 29 U.S.C. §§ 1301–1381 (1974), created a program for plan termination insurance, to be administered by the Pension Benefit Guaranty Corp. ("PBGC"), a wholly-owned government corporation within the Department of Labor. 29 U.S.C. § 1302. Congress designed this "insurance program" to operate in the following manner: the covered pension plans would pay insurance premiums to the PBGC, who would distribute benefits to plan participants in the event that a plan was terminated without sufficient assets to cover its guaranteed benefits.[4] *See* §§ 1322, 1361. ERISA's insurance program created an important distinction between single employer pension plans and multiemployer pension plans:[5]

1. There are several pending motions in this case. This opinion addresses only the statutory and constitutional issues stemming from the Fund's application of the controlled group theory to defendants, and the defendants' constitutional claims regarding the withdrawal liability provisions of the MPPAA. The remaining issues will be resolved in subsequent memorandum opinions.

2. The court's chronology of the adoption of ERISA and the MPPAA is derived from the Supreme Court's recent opinion in *PBGC v. R.A. Gray & Co.*, 467 U.S. 717, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984) and the legislative history of the two statutes. *See generally* H.Rep. No. 93–533, 93d Cong., 2d Sess., *reprinted in* 1974 U.S. Code Cong. & Admin.News 4639 (ERISA); H.Rep. No. 96–869, PART I, 96th Cong., 2d Sess. 1, *reprinted in* 1980 U.S. Code Cong. & Admin. News 2918 (MPPAA).

3. ERISA's coverage extends only to defined benefit plans, not defined contribution plans. The Supreme Court explained the difference between the two types of pension plans in *Nachman Corp. v. PBGC*, 446 U.S. 359, 363 n. 5, 100 S.Ct. 1723, 1727 n. 5, 64 L.Ed.2d 354 (1980): '[P]etitioner's plan is a defined benefit plan, under which the benefits to be received by employees are fixed and the employer's contribution is adjusted to whatever level is necessary to provide those benefits. The other basic type of pension is a defined contribution plan, under which the employer's contribution is fixed and the employee receives whatever level of benefits the amount contributed on his behalf will provide.' (*citing Alabama Power Co. v. Davis*, 431 U.S. 581, 593 n. 18 [97 S.Ct. 2002, 2009 n. 18, 52 L.Ed.2d 595] (1977). ERISA's termination insurance program does not apply to defined contribution plans, *see* 29 U.S.C. § 1321(b)(1), for the reason that under such plans, by definition, there can never be an insufficiency of funds to cover promised benefits.

4. The PBGC insures nonforfeitable benefits upon termination of a pension plan without sufficient funds to pay these benefits in full. *See* 29 U.S.C. § 1302(a). Typically, an employee's right to guaranteed benefits "vests" after he works a designated number of years in covered employment, and he complies with any other vesting conditions in the plan. *See Nachman Corp. v. PBGC*, 446 U.S. 359, 363–64, 100 S.Ct. 1723, 1727–28, 64 L.Ed.2d 354 (1980). *See also* 29 C.F.R. § 2613.6.

5. A multiemployer pension plan is a plan
 (i) to which more than one employer is required to contribute,
 (ii) which is maintained pursuant to one or more collective bargaining agreements between one or more employee organizations and more than one employer, and
 (iii) which satisfies such other requirements as the Secretary may prescribe by regulation. 29 U.S.C. § 1002(37)(A). A single employer plan is any covered plan which does not satisfy the definition of a multiemployer plan.

the PBGC's obligation to pay benefits for terminated single employer pension plans commenced immediately upon the statute's passage in 1974. § 1381(a), (b). In contrast, the statute provided that the PBGC would not become obligated to disburse guaranteed payments in the case of defaulting multiemployer plans until January 1, 1978. § 1381(c)(1).

In the interim, the PBGC could, in its discretion, distribute benefits following the termination of a multiemployer pension plan. § 1381(c)(2)–(4). If the PBGC distributed benefits under this section, employers who had paid into the plan during the preceding five years were liable to the PBGC in amounts proportional to their share of the plan's contributions during those periods. Thus, an employer who withdrew from a multiemployer plan exposed himself to a contingent liability dependent upon the plan's termination within the following five years and the PBGC's discretionary decision to pay guaranteed benefits. Even if the employer were liable by virtue of the occurrence of these two events, the statute limited his liability to an amount not to exceed 30% of his net worth. § 1362(b)(2). *See* § 1364(b).

As the date for mandatory coverage of multiemployer pension plans drew near, Congress began to express concern over the number of these plans experiencing significant financial hardship. The complete termination of these large pension plans could bankrupt the PBGC by forcing it to assume obligations beyond its capacity. In order to properly address this problem, Congress deferred the provisions dictating mandatory insurance coverage for multiemployer pension plans, and directed the PBGC to compile a comprehensive report addressing the problems unique to multiemployer pension plans and suggesting appropriate remedial legislation to alleviate these problems.[6]

The PBGC issued its report on July 1, 1978. Its principal criticism of ERISA's provisions relating to multiemployer plans was that "ERISA did not adequately protect plans from the adverse consequences that resulted when individual employers terminate their participation in, or withdraw from, multiemployer plans." *PBGC v. R.A. Gray & Co.*, 104 S.Ct. at 2714. The PBGC's Executive Director explained:

A key problem of ongoing multiemployer plans, especially in declining industries, is the problem of employer withdrawal. Employer withdrawals reduce a plan's contribution base. This pushes the contribution rate for remaining employers to higher and higher levels in order to fund past service liabilities, including liabilities generated by employers no longer participating in the plan, so-called inherited liabilities. The rising costs may encourage—or force—further withdrawals, thereby increasing the inherited liabilities to be funded by an ever-decreasing contribution base. This vicious downward spiral may continue until it is no longer reasonable or possible for the pension plan to continue.

*Gray*, 104 S.Ct. at 2714 n. 2, *citing* "Pension Plan Termination Insurance Issues," Hearings Before the Subcommittee on Oversight of the House Committee on Ways and Means, 95th Cong., 2d Sess. 22 (1978) (statement of Matthew M. Lind). The PBGC suggested that in order to avoid these dire consequences, Congress should amend ERISA to include new rules wherein an employer withdrawing from a multiemployer pension plan would be required to

---

**6.** Pub.L. No. 95–214, 91 Stat. 1501 (1977). In *PBGC v. R.A. Gray & Co.*, 467 U.S. 717, 721 n. 1, 104 S.Ct. 2709, 2714 n. 1, 81 L.Ed.2d 601 (1984), the Supreme Court chronicled Congress' subsequent deferrals of mandatory coverage:

The effective date for mandatory insurance coverage of multiemployer plans was subsequently deferred to May 1, 1980, Pub.L. No. 96–24, 93 Stat. 70 (1979), to July 1, 1980, Pub.L. No. 96–239, 94 Stat. 341 (1980), and finally to August 1, 1980, Pub.L. No. 96–293, 94 Stat. 610 (1980). On each occasion, Congress was providing more time for thorough consideration of the complex issues posed by the termination of multiemployer pension plans. Ultimately, mandatory insurance coverage was superseded by the Multiemployer Pension Plan Amendments Act of 1980, Pub.L. No. 96–364, 94 Stat. 1208 (1980).

pay his proportional share of the plan's unfunded vested liabilities. The advantages of the proposed withdrawal liability were two-fold: first, it would "discourage voluntary withdrawals and curtail the current incentives to flee the plan;" and second, "[w]here such withdrawals [do] occur, ... withdrawal liability would cushion the financial impact on the plan." *Gray*, 104 S.Ct. at 2714–15 n. 3 (*citing* statement of Matthew M. Lind).

Congress took the PBGC's recommendations to heart, and amended ERISA by enacting the MPPAA in 1980. *See* 29 U.S.C. §§ 1381 *et seq.* "As enacted, the [MPPAA] requires an employer withdrawing from a multiemployer pension plan pay a fixed and certain debt to the pension plan. This withdrawal liability is the employer's proportionate share of the plan's 'unfunded vested benefits,' calculated as the difference between the present value of the vested benefits and the current value of the plan's assets." *Gray* at 2715, *citing* 29 U.S.C. §§ 1381, 1391.

The MPPAA thus created a statutory framework whereby an employer who terminates or significantly reduces the level of his contributions to a multiemployer pension plan would no longer be able to evade his responsibility to fund the plan. Under the MPPAA, an employer who effects a complete or partial withdrawal from the plan will be liable for a proportionate share of the plan's unfunded vested benefit liability at the time of his withdrawal.

The MPPAA requires an assessment of withdrawal liability if an employer effects either a complete or partial withdrawal from the plan. A complete withdrawal occurs if an employer (1) permanently ceases to have an obligation to contribute under the plan, or (2) permanently ceases all covered operations under the plan. 29 U.S.C. § 1383(a). A partial withdrawal occurs if (1) there is a seventy percent contribution decline for a given plan year,[7] or (2) there is a partial cessation of the employer's contribution obligation.[8] 29 U.S.C. § 1385. In addition to defining complete and partial withdrawals, the MPPAA also creates specific statutory exemptions by defining circumstances which should not be labelled withdrawals.[9]

After the fund determines that a complete or partial withdrawal has occurred, the trustees must calculate the appropriate withdrawal liability assessment, following the statutory scheme outlined in the MPPAA. In the case of a partial withdrawal, the fund first determines the assessment as if a complete withdrawal had occurred, and then multiples this amount

---

**7.** 29 U.S.C. § 1385(b)(1)(A) defines the circumstances in which a 70% decline occurs:

> There is a 70-percent contribution decline for any plan year if during each plan year in the 3-year testing period the employer's contribution base units do not exceed 30 percent of the employer's contribution base units for the high base year.
> (B) For purposes of subparagraph (A)—
> (i) The term "3-year testing period" means the period consisting of the plan year and the immediately preceding 2 plan years.
> (ii) The number of contribution base units for the high base year is the average number of such units for the 2 plan years for which the employer's contribution base units were the highest within the 5 plan years immediately preceding the beginning of the 3-year testing period.

**8.** 29 U.S.C. § 1385(b)(2)(A) defines a partial cessation in the employer's contribution obligation:

> There is a partial cessation of the employer's contribution obligation for the plan year if, during such year—
> (i) the employer permanently ceases to have an obligation to contribute under one or more but fewer than all collective bargaining agreements under which the employer has been obligated to contribute under the plan but continues to perform work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required or transfers such work to another location, or
> (ii) an employer permanently ceases to have an obligation to contribute under the plan with respect to work performed at one or more but fewer than all of its facilities, but continues to perform work at the facility of the type for which the obligation to contribute ceased.

**9.** *See e.g.,* 29 U.S.C. §§ 1383(b), (c); 1384; 1385(b)(2)(B); 1390; 1398(1), (2).

by a "partial withdrawal liability fraction." 29 U.S.C. §§ 1391, 1386.[10]

### The Controlled Group Concept

Title IV (Subchapter III) of ERISA created the plan termination insurance program and the PBGC. As set forth earlier, this subchapter provided mandatory insurance if an employer withdrew from a single-employer plan, and invested discretionary authority in the PBGC to provide insurance when an employer withdrew from a multiemployer plan. To assist the PBGC in these determinations, the subchapter contains its own definitional section. 29 U.S.C. § 1301. The critical definition for the purposes of this motion is codified at 29 U.S.C. § 1301(b)(1):

> ... For purposes of this subchapter, under regulations prescribed by the corporation, all employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single employer and all such trades and businesses as a

single employer. The regulations prescribed under the preceding sentence shall be consistent and coextensive with regulations prescribed for similar purposes by the Secretary of the Treasury under Section 414(c) of title 26.[11]

Both the House and the Senate endorsed the inclusion of this provision in ERISA's statutory scheme. The primary purpose of this "controlled group" definition was to ensure that employers could not circumvent ERISA's coverage and antidiscrimination provisions by operating through separate corporations instead of separate branches of one corporation. *See* S.Rep. No. 93–383, 93rd Cong., 2d Sess. 43, *reprinted* in 1974 U.S.Code Cong. & Admin. News 4639, 4890, 4928. *See also* H.Rep. No. 93–807, 93rd Cong., 2d Sess. 50, *reprinted* in 1974 U.S.Code Cong. & Admin. News 4670, 4716.[12]

Few cases have addressed the scope of ERISA's "controlled group" definition of employer. The preeminent case discussing

---

10. The partial withdrawal liability fraction is calculated as follows:

1 minus a fraction—
(A) the numerator of which is the employer's contribution base units for the plan year following the plan year in which the partial withdrawal occurs, and
(B) the denominator of which is the average of the employer's contribution base units for—
(i) except as provided in clause (ii), the 5 plan years immediately preceding the plan year in which the partial withdrawal occurs, or
(ii) in the case of a partial withdrawal described in section 1385(a)(1) of this title (relating to 70-percent contribution decline), the 5 plan years immediately preceding the beginning of the 3-year testing period.

29 U.S.C. § 1386(a)(2)(A), (B).

11. 26 U.S.C. § 414(c) provides:

**(c) Employees of partnerships, proprietorships, etc., which are under common control.** For purposes of sections 401, 408(k), 410, 411, and 415, under regulations prescribed by the Secretary, all employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single employer. The regulations prescribed under this subsection shall be based on principles similar to the principles which apply in the case of subsection (b).

The PBGC promulgated regulations pursuant to 29 U.S.C. § 1301(b)(1). *See* 29 CFR § 2612.

These regulations incorporate § 414(c) by reference, which, by its terms, is assimilated into the provisions of 26 U.S.C. § 414(b). Section 414(b), which applies to employees of a controlled group of corporations, relies upon the definition of controlled group in 26 U.S.C. § 1563(a). Section 1563(a) describes three types of corporate controlled groups: "parent-subsidiary," "brother-sister" and "combined groups."

12. The House Report explained:

The committee bill also provides that in applying the coverage test, as well as the antidiscrimination rules, the vesting requirements, and the limitations on and benefits, employees of all corporations who are members of a 'controlled group of corporations' (within the meaning of sec. 1563(a)) are to be treated as if they were employees of the same corporation. Thus, if two or more corporations were members of a parent-subsidiary, brother-sister, or combined controlled group, all of the employees of all of these corporations would have to be taken into account in applying these tests.... The committee, by this provision, intends to make it clear that the coverage and antidiscrimination provisions cannot be avoided by operating through separate corporations instead of separate branches of one corporation.

H.Rep. No. 93–807, 93d Cong., 2d Sess, *reprinted in* 1974 U.S.Code Cong. & Admin.News 4670, 4716.

this statutory definition is *PBGC v. Ouimet,* 470 F.Supp. 945 (D.Mass.1979), *aff'd,* 630 F.2d 4 (1st Cir.1980), *cert. denied,* 450 U.S. 914, 101 S.Ct. 1356, 67 L.Ed.2d 339 (1981), *on appeal after remand,* 711 F.2d 1085 (1st Cir.), *cert. denied,* 464 U.S. 961, 104 S.Ct. 393, 78 L.Ed.2d 337 (1983). In *Ouimet,* two wholly-owned subsidiaries of the Ouimet Corporation declared bankruptcy. Both had maintained single employer pension plans covered by ERISA, which were underfunded at the time of their bankruptcies. The PBGC, which was statutorily obligated to insure the payment of vested benefits under the plan, sought reimbursement from the corporate parent and several affiliates pursuant to 29 U.S.C. § 1362. The PBGC argued that these parties should be jointly and severally liable for the underfunding in the subsidiaries' pension plans because they were all members of one "controlled group" as defined in 29 U.S.C. § 1301(b)(1). The defendants contested their inclusion in a controlled group, arguing that it would be inequitable to hold them responsible for the underfunding of a plan to which they did not even contribute. The court rejected this argument, concluding that the statute clearly required the treatment of corporate affiliates as one entity for the purposes of withdrawal liability. *Ouimet,* 470 F.Supp. at 950–53. The court reasoned that the plain language of the statute, reinforced by clearly expressed Congressional intent, mandated the conclusion that all members of an ERISA "controlled group" will be liable for the unfunded vested benefits liability of a single withdrawing member. *Id.* at 953.

The *Ouimet* defendants also challenged the constitutionality of the court's finding of controlled group liability. The court rejected the group's due process argument, finding that Congress' controlled group definition was neither arbitrary nor irrational. *Id.* at 955. On appeal, the First Circuit affirmed with instructions. *PBGC v. Ouimet,* 630 F.2d 4 (1st Cir.1980), *cert. denied,* 450 U.S. 914, 101 S.Ct. 1356, 67 L.Ed.2d 339 (1981) (*Ouimet I*). The court held that the plain meaning of the statute and the underlying Congressional intent supported the District Court's interpretation of ERISA's controlled group provision. *Id.* at 12. The court also upheld the constitutionality of applying this controlled group definition to the Ouimet Group. *Id.*

In *Ouimet I,* the First Circuit remanded the case to the district court for an allocation of liability among the members of the controlled group. On appeal from the district court's allocation of liability, the First Circuit reversed the district court's method of distribution. *PBGC v. Ouimet Corp.,* 711 F.2d 1085 (1st Cir.), *cert. denied,* 464 U.S. 961, 104 S.Ct. 393, 78 L.Ed.2d 337 (1983) (*Ouimet II*).[13] In so doing, it refuted several of the group's arguments regarding the funds to be included in this calculation, and the constitutionality of applying this provision to the Ouimet group. First, the court held that the constitution did not forbid an assessment against the Ouimet group which included the unfunded liability of the bankrupt subsidiaries which had accrued prior to their membership in the Ouimet group. The court reasoned:

13. ERISA limited an employer's withdrawal liability to 30% of its net worth. 29 U.S.C. § 1362(b)(2). In *Ouimet,* the district court accepted the PBGC's determination of the group's net worth. It recognized but rejected the argument that the thirty percent limitation could operate to relieve the bankrupts of liability because they had no net worth. The court then reached an allocation

based upon the thirty percent of net worth limitation; for the bankrupts, however, he substituted thirty percent of asset value for thirty percent of net worth. Based on ratios arrived at by dividing thirty percent of each

member's net worth and thirty percent of the bankrupts' asset values by the total of thirty percent of the Group's aggregate net worth plus thirty percent of the bankrupts' asset values, the judge allocated [the withdrawal liability owed to the bankrupt subsidiaries' pension].

*Ouimet II,* 711 F.2d at 1088. The First Circuit reversed this allocation, holding that the assets of the bankrupts should not be included in the allocation of liability. *Id.* at 1092 ("[S]olvent members of the Ouimet Group, and not Avon's creditors, should bear responsibility for the liability to PBGC").

[R]ationality in due process terms [does not] require a dollar by dollar accounting of the financial benefits controlled group members have realized as a result of their affiliation with the terminating employer. The mere fact that such benefits typically accrue in the controlled group setting is sufficient to support a conclusion that Congress acted rationally and not arbitrarily in drafting ERISA to impose retroactive liability on controlled group members.... It does not require a quantum leap for us now to hold explicitly that imposing on the entire Group the $92,000 liability relating to the period before Avon was acquired does not violate due process.

*Ouimet II,* 711 F.2d at 1089–90.

In so holding, the *Ouimet* court disagreed with *PBGC v. Anthony Co.,* 537 F.Supp. 1048 (N.D.Ill.1982), *supp. op.* 542 F.Supp. 43. In *Anthony,* the court upheld the constitutionality of imposing controlled group liability on the employer's parent, but narrowed the potential scope of this liability. The *Anthony* court concluded that it would be consistent with due process to hold the acquiring parent responsible for "underfunding to the extent of any direct financial benefits it derived from the subsidiary during its affiliation." *Anthony,* 537 F.Supp. at 1056 (footnote omitted). Although the *Anthony* opinion is not entirely clear on this point, it suggests that the imposition of liability on the parent for pre-acquisition underfunding of the subsidiary could violate the due process clause because the parent and other members of the controlled group did not derive any financial benefits from the subsidiary during this period. *Id. See Ouimet II,* 711 F.2d at 1089. In *Ouimet II,* the court

rejected this suggestion that due process limits a parent's responsibility for the unfunded vested liability of its subsidiary to the financial benefits flowing from the subsidiary to the parent. *Ouimet II,* 711 F.2d at 1089 ("The analysis in *Anthony* ignored the realities of business affiliation, such as that a parent does not have to actually receive dividend payments to benefit from its subsidiary's successful operations.").

Although the *Ouimet* decisions addressed the controlled group provision in the context of a withdrawal from a single employer plan, their conclusions may be transposed to cases involving withdrawals from multiemployer plans. When ERISA was enacted in 1974, the "controlled group" definition of employer applied to both single-employer pension plans and multiemployer pension plans.[14] Prior to the promulgation of the MPPAA, 29 U.S.C. § 1362 provided the method for determining liability for withdrawal from single employer plans, and § 1364 dictated the role of the PBGC with respect to withdrawals from multiemployer pension plans. However, the controlled group definition applied, regardless of the type of plan involved. *See PBGC v. Ouimet Corp.,* 470 F.Supp. 945, 953 n. 20 (D.Mass.1979), *aff'd,* 630 F.2d 4 (1st Cir.1980), *cert. denied,* 450 U.S. 914,, 101 S.Ct. 1356, 67 L.Ed.2d 339 (1980). *See also* H.Rep. No. 96–869 PART I, 96th Cong., 2d Sess. 72, *reprinted in* 1980 U.S.Code Cong. & Admin.News 2918, 2940; H.Rep. No. 96–869 PART II, 96th Cong., 2d Sess. 4, *reprinted in* 1980 U.S. Code Cong. & Admin.News 2992, 2995.

When Congress enacted the MPPAA in 1980, it reaffirmed the applicability of the controlled group concept in the context of a withdrawal from a multiemployer plan.

---

**14.** Aside from § 1301(b)(1), which by its terms applied to multiemployer withdrawals under § 1364, ERISA contained an additional reference to the controlled group concept in the context of multiemployer plans. 29 U.S.C. § 1002(37), which defined multiemployer plans, originally provided that

> all corporations which are members of a controlled group of corporations (within the meaning of section 1563(a) of title 26, determined without regard to section 1563(c)(3)(C)

of title 26) shall be deemed to be one employer.

29 U.S.C. § 1002(37)(B)(ii) (1974). This definition was amended in 1980 to provide:

> (B) For purposes of this paragraph, all trades or businesses (whether or not incorporated) which are under common control within the meaning of section 1301(b)(1) of this title are considered a single employer.

29 U.S.C. § 1002(37)(B) (1980).

Senator Williams, one of the MPPAA's sponsors in the Senate, emphasized:

> Under current law, a group of trades or businesses under common control, whether or not incorporated, is treated as a single employer for purposes of employer liability under Title IV. Thus, if a terminating single employer plan is maintained by one or more members of a controlled group, the entire group is the "employer" and is responsible for any employer liability. The leading case in this area is *Pension Benefit Guaranty Corp. v. Ouimet Corp.*, 470 F.Supp. 945 (D.Mass.1979), in which the court correctly held that all members of a controlled group are jointly and severally liable for employer liability imposed under section 4062 [29 U.S.C. § 1362] of ERISA. The bill does not modify the definition of 'employer' in any way, and the *Ouimet* decision remains good law.

126 Cong.Rec. 23287 (August 26, 1980) (remarks of Sen. Williams).

### The Robbins and Central States Complaints

In 1981, the Trustees of the Central States Pension Fund determined that the Pepsi-Cola Metropolitan Bottling Co. ("Pepsi-Cola") and Pepsico, Inc. ("Pepsico") had effected a partial withdrawal from the Fund, due to Pepsi-Cola's permanent cessation of its obligation to contribute to the Fund. (*Robbins* complaint ¶ 6). The Trustees notified Pepsi-Cola of this determination, calculated the amount of withdrawal liability, and notified both defendants of the amount of the assessment. When Pepsi-Cola failed to pay the assessment, the Trustees filed suit. *Robbins, et al. v. Pepsico, et al.*, No. 84 C 170. The Trustees allege that these two corporations consti-

tute a "controlled group" within the meaning of 29 U.S.C. § 1301(b)(1), and therefore are both liable for withdrawal liability arising out of Pepsi-Cola's alleged withdrawal in 1981. The Trustees' determination of partial withdrawal liability and their calculation of the liability assessment were both predicated on the assumption that under Section 1301(b)(1), Pepsi-Cola and Pepsico should be treated as one entity ("Pepsi" or "Pepsi controlled group"). The *Robbins* defendants filed an answer and counterclaims, alleging that the Trustees attempted imposition of withdrawal liability was unlawful. The counterclaims added six additional counterclaimants, Frito-Lay, Inc. ("Frito-Lay"), Pepsi-Cola Bottling Co. of Los Angeles ('Pepsi/L.A."), Taco Bell Corp. ("Taco Bell"), Pizza Hut, Inc. ("Pizza Hut"), Wilson Sporting Goods Co. ("Wilson") and North American Van Lines, Inc. ("NAVL"), and one additional counterdefendant, the Central States, Southeast and Southwest Areas Pension Fund ("Central States" or "the Fund").[15]

In late 1985, the Central States Fund filed another lawsuit seeking liability assessments for alleged withdrawals in 1982, 1983 and 1984. *Central States, Southeast and Southwest Areas Pension Fund, et al. v. Pepsico, et al.*, No. 85 C 9385[16]. The *Central States* complaint expanded the membership of the Pepsi controlled group. This group is now comprised of Pepsico, Pepsi-Cola, Frito-Lay and Wilson. This complaint seeks withdrawal liability for alleged withdrawals by Pepsi-Cola and Frito-Lay in 1982 and 1983. Furthermore, the complaint alleges that Pepsico's sale of LeeWay Motor Freight, Inc. ("Lee Way") in 1984 effected a 98% decline in the controlled group's contribution base units to the fund, thereby causing a complete with-

---

**15.** Several of the defenses and counterclaims seek to invalidate the Trustees' liability assessment on statutory and constitutional grounds. The remaining claims seek indemnity from the Fund and/or the trustees on a variety of statutory and common law grounds. Pepsi has also filed a third-party indemnity action against the Fund's former Trustees on similar statutory grounds. This opinion addresses only the statutory and constitutional claims directly related to the Fund's attempted imposition of withdrawal liability. The remaining issues will be addressed in subsequent opinions.

**16.** Pepsi's answer and counterclaims in this lawsuit parallels that filed in Robbins, with certain minor exceptions. These two lawsuits were consolidated by order of this court on December 26, 1985.

drawal within the meaning of 29 U.S.C. § 1383(a).[17] The Fund's determination of withdrawal and calculation of withdrawal liability in the *Central States* lawsuit were also predicated on the controlled group concept.

The withdrawal liability assessments calculated by the Trustees for Pepsi's alleged withdrawals from 1981 through 1984 are substantial. The *Robbins* complaint seeks a judgment in the amount of $2.38 million plus interest for the alleged 1981 withdrawal. The *Central States* complaint seeks over $18.5 million plus interest[18] for the alleged complete and partial withdrawals occurring in 1982, 1983 and 1984.

The Pepsi defendants vigorously oppose the Trustees' method of computing withdrawal liability in these cases. They argue that the Fund's decision to treat the Pepsi group as one entity in its determination of the alleged withdrawal and its calculation of withdrawal liability produces two anomolous results. First, it assessed liability for conduct which, in and of itself, did not constitute a statutory withdrawal;[19] and second, its calculations, based on the controlled group theory, impose an inflated withdrawal liability.[20] According to the de-

17. The following diagram illustrates the relationship between the defendants in these lawsuits:

```
 Pepsico*
 | 100%
 _____|_____
 | | | | | |
Pepsi-Cola* Frito-Lay* Wilson* Lee Way Motor Pepsi/LA** Taco NAVL**
 (until May 1985) Freight Bell**
 (until Aug. 1984)
```

 \* defendants/counterclaimants
 \*\* counterclaimants

18. Count I of the *Central States* complaint seeks $11.469 million for the 1982 assessment; Count II seeks monthly payments of $639,000 for the 1983 assessment, pending the outcome of a review requested pursuant to 29 U.S.C. § 1399(b)(2)(A), and Count III seeks $7.1 million for the alleged complete withdrawal in 1984.

19. With respect to determining the fact of a withdrawal, treatment of the Pepsi group as one entity yields two consequences. First, it converts activities which might constitute a complete withdrawal into a partial withdrawal. For instance, if an employer permanently ceases his obligation to contribute under the plan or permanently ceases all covered operations under the plan, this conduct would ordinarily be characterized as a complete withdrawal. *See* 29 U.S.C. § 1383. If that employer is a member of a controlled group, however, this conduct is characterized as a partial withdrawal because it actually reflects only a partial cessation of the entire group's contribution obligation. This conduct would constitute a partial withdrawal regardless of whether the employer was part of a controlled group entity, however. *See* 29 U.S.C. § 1385. Thus, when Pepsi-Cola permanently ceased its obligation to contribute in 1981, this conduct was characterized as a partial withdrawal of the controlled group from its

contribution obligations, and the withdrawal liability was assessed accordingly.

Second, the conduct of one member which does not constitute either a complete or a partial withdrawal, when combined with similar conduct of other members, could cause either a complete or partial withdrawal of the entire controlled group, because the withdrawal determination focuses on the cumulative effect of the activities of the entire group. In Pepsi's case, the Fund determined that the partial withdrawals of Frito-Lay and Wilson, combined with the sale of Lee Way, caused an overall decline in the contribution base units of the entire group, thereby precipitating a complete withdrawal under 29 U.S.C. § 1383. Thus, even if neither company effected a complete withdrawal, the combined effect of their partial withdrawals placed the Pepsi group within the definition of complete withdrawal contained in § 1383. Using the controlled group definition, the conduct of individual members of the group is not viewed in a vacuum, but is judged only to the extent that it affects the overall contributions of the entire Pepsi group.

20. The use of the controlled group concept in the calculation of liability assessments also produces different results than those obtained if the corporations were considered on a corporation-by-corporation basis. Instead of computing the assessment on the basis of one members' contri-

fendants, the Fund's interpretation and application of the controlled group provision in this manner is both constitutionally infirm and contrary to the Congressional intent underlying the promulgation of the MPPAA.

The Trustees interpreted Section 1301(b)(1) to control all aspects of the withdrawal liability assessment, and treated the Pepsi group as one entity when resolving all issues relating to withdrawal liability. Their determination of the fact of a withdrawal and calculation of liability are not necessarily predicated on the conduct of the parent (Pepsico) or any one subsidiary. Rather, they are based on the cumulative effect of the various activities of each member of the controlled group on the entity's overall contribution base units ("CBUs").[21] The Trustees' interpretation of the statute was endorsed by the PBGC in an amicus brief filed with this court on December 18, 1984.

In contrast, Pepsi asserts that the statute should be interpreted to allow only the imposition of liability on all members of the controlled group; the fact of a withdrawal and the calculation of a liability assessment should be determined on a separate corporation-by-corporation basis. Pepsi challenges the Fund's interpretation and application of the controlled group definition on both statutory and constitutional grounds.[22]

### Application of the Controlled Group Definition To Multiemployer Pension Plans

To this court's knowledge, no court has addressed the statutory and constitutional implications of this controlled group provision as applied to a multiemployer pension plan. The *Ouimet* decisions, which contain the most extensive analysis of Section 1301(b)(1) in the single employer context, did not encounter the same statutory and constitutional problems raised in this case. On the one hand, Pepsi's objections focus on the argument that the Fund should not treat Pepsi-Cola and its subsidiaries as one

---

bution history, the calculation is predicated on the entire group's contributions to the plan. For instance, in the case of a partial withdrawal, the Fund would calculate the assessment for a complete withdrawal, and then multiply that amount by one minus a partial withdrawal liability fraction. The numerator of this fraction reflects the controlled group's CBUs for the plan year after the partial withdrawal, and the denominator is composed of the average number of CBUs for the five years immediately preceding the partial withdrawal. *See* 29 U.S.C. § 1386(a)(2)(A)(B). Pepsi argues that the resulting calculations produce a withdrawal liability assessment grossly disproportionate to that which would be obtained if the calculations were performed on a corporation by corporation basis. *See* Def.Mem. in Opp. to Motion for Summary Judgment, Exs. A, B, C.

**21.** 29 U.S.C. § 1301(a)(11) defines CBUs:

'contribution base unit' means a unit with respect to which an employer has an obligation to contribute under a multiemployer plan, as defined in regulations prescribed by the Secretary of the Treasury.

A change in an employer's number of CBUs is integrally related to the determination of a withdrawal and calculation of liability. *See, e.g.,* 29 U.S.C. § 1385(1) (defining a partial withdrawal as a 70% contribution decline); § 1386 (computation of the partial withdrawal liability frac-

tion); and § 1391 (computation of complete withdrawal liability).

**22.** Pepsi's amended answer and counterclaims alleges seven claims relating to the Trustees' interpretation of § 1301(b)(1). The tenth affirmative defense and fifth counterclaim alleges that the application of the controlled group provision of ERISA is an improper construction of ERISA and the MPPAA. The eleventh affirmative defense and sixth counterclaim alleges that application of the controlled group provision is unconstitutional as applied to Pepsi. The fourteenth counterclaim is asserted by Wilson only, and claims that § 1301(b)(1) has been unconstitutionally applied to it. The fifteenth counterclaim alleges that the 1983 contribution claim, based on the controlled group theory, is an improper construction of the withdrawal liability provisions of the MPPAA, and is inequitable and contrary to law. The sixteenth counterclaim asserts that use of the controlled group provision effects an unconstitutional taking of property, deprives counterclaimants of their due process rights, and impairs their contractual obligations. The eighteenth counterclaim alleges that the imposition of withdrawal liability resulting from the sale of Lee Way in 1984 is an improper construction of the MPPAA, and the nineteenth counterclaim alleges that the Fund's attempt to hold defendants liable for an alleged withdrawal following this sale is unconstitutional.

group when determining *whether* a withdrawal occurred, or when calculating *how much* the entire group owes the Fund as a result of this "entity" withdrawal. These problems do not arise in the case of a single employer plan because a withdrawal and the resulting amount of withdrawal liability are determined in accordance with the conduct of one employer and the unfunded vested liability of his fund. Thus, in single employer cases like *Ouimet*, the determination of withdrawal and calculation of liability are, of necessity, determined on a corporation-by-corporation basis. According to Pepsi, the controlled group definition should only come into play when the Fund determines *who* is responsible for payment of the unfunded vested liability. Section 1301(b)(1) then instructs the PBGC to assess joint and several liability against all members of the control group for the withdrawal of one member from its single employer plan.

On the other hand, the Trustees and the PBGC urge this court to apply Section 1301(b)(1) to all aspects of the withdrawal liability determination. They contend that this court should not reject the PBGC's interpretation of the statute unless it is contrary to the provisions of the statute or its underlying legislative history.[23] *Nachman v. PBGC*, 446 U.S. 359, 374, 100 S.Ct. 1723, 1732, 64 L.Ed.2d 354 (1980) (footnote omitted). *See also Chemical Mfrs. Ass'n v. Natural Resource Defense Council*, 470 U.S. 116, 105 S.Ct. 1102, 1108, 84 L.Ed.2d 90 (1985) ("[V]iew of the agency charged with administering the statute is entitled to considerable deference."); *Red Lion*

*Broadcasting Co. v. FCC*, 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371 (1969) ("construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong.").

"[T]he starting point for interpreting a statute is the language of the statute itself." *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). Absent a conflicting legislative intent to the contrary, the statutory language is ordinarily considered conclusive. *Id.* Furthermore, the court should adhere to the "fundamental canon of statutory construction that, unless otherwise defined, words will be interpreted as taking their ordinary ... meaning." *Perrin v. United States*, 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979). *See also Escondido Mutual Water Co. v. La Jolla*, 466 U.S. 765, 104 S.Ct. 2105, 2110, 80 L.Ed.2d 753 (1984).

◼ Following these basic precepts of statutory construction, the court finds that Section 1301(b)(1)'s definition of employer clearly applies to all decisions relating to withdrawals from multiemployer pension plans. Section 1301(b)(1) specifically states that the controlled group provision *shall apply* "for the purposes of this Title." The Title referred to is Title IV of ERISA, which details the role of the PBGC and the determination of withdrawal liability. Title IV also includes all the MPPAA provisions[24] outlining the determination and

**23.** Pepsi asserts that the court should not defer to the PBGC's interpretation of the statute because the PBGC has a personal interest in construing the statute to provide the maximum amount of withdrawal liability. The court recognizes that the PBGC's duty to insure the Fund's unfunded vested benefits of the Fund could motivate it to resist an interpretation of the statute which would result in a reduction of the employer's liability. However, this does not mean that the PBGC's opinions should be automatically discredited, especially when the court's inquiry concerns matters directly related to the PBGC's expertise. This court is unaware of any case wherein the views of the PBGC were discarded merely because it had an interest in

the outcome of the case. In fact, the cases reviewed by this court indicate that the courts have accorded the PBGC the same degree of deference accorded to other federal regulatory agencies. *See, e.g., Nachman v. PBGC,* 446 U.S. 359, 374, 100 S.Ct. 1723, 1732, 64 L.Ed.2d 354 (1980); *In re Challenge Stamping & Porcelain Co.,* 719 F.2d 146, 150 (6th Cir.1983).

**24.** Prior to the passage of the MPPAA, this definition applied to both single and multiemployer plans, although its predominant use was in the area of single employer plans. *See, e.g., Ouimet I; Ouimet II.* Congress' intent to treat all "controlled groups" as one entity, the ERISA "employer," is further evidenced by its inclusion of

computation of withdrawal liability. The mandatory nature of the language in Section 1301(b)(1) appears to require the PBGC and the Fund to consider the Pepsi group as one entity with respect to all withdrawal liability decisions made pursuant to Title IV. Thus, the plain language of the statute clearly supports the Fund's assertion that the controlled group definition must be used to determine the fact of a withdrawal and to calculate the entire entity's withdrawal liability assessment.[25] *Cf. Escondido Mutual Water Co. v. La Jolla,* 466 U.S. 765, 104 S.Ct. 2105, 2110, 80 L.Ed.2d 753 (1985).

Pepsi asserts that the controlled group definition should only be used to determine *who* will be liable for a withdrawal liability assessment, and that issues regarding the fact of a withdrawal or the calculation of liability should be resolved on a corporation-by-corporation basis. Pepsi's suggested interpretation of Section 1301(b)(1) finds no support in the language of the statute. In fact, the unqualified language of Section 1301(b)(1) actually precludes such an interpretation. *See Dorn's Transportation, Inc. v. Teamsters Pension Trust Fund,* 596 F.Supp. 350, 355 (D.N.J.1984), *aff'd,* 787 F.2d 897 (3rd Cir.1986) ("[N]othing in the language of § 1301(b) ... suggests that it is only intended as a collection device."). *See also Ouimet I,* 630 F.2d 4, 10–11 (1st Cir.1980), *cert. denied,* 450 U.S. 914, 101 S.Ct. 1356, 67 L.Ed.2d 339 (1981); *PBGC v. Anthony,* 537 F.Supp. 1048, 1051 (N.D.Ill.1982).

In *Connors v. Calvert Development Corp.,* 622 F.Supp. 877 (D.D.C.1985), the court rejected a similar request for piecemeal application of Section 1301(b)(1). In *Connors,* two members of a controlled group withdrew from a multiemployer pension plan. The Fund notified the withdrawing members of their withdrawal liability assessment [*See* 29 U.S.C. § 1399(b)(1) ], but it did not notify the other members of the controlled group. When the withdrawing companies failed to pay, the Fund sued the entire group. The non-withdrawing members asserted that § 1301(b)(1) does not control the notice and demand provisions of Title IV, and each individual member must receive a notice and demand for payment before a suit for payment could be initiated against them.

The court rejected the defendants' attempt to carve out an exception to the clear, all-inclusive language of § 1301(b)(1). It concluded that, "[t]he requirement that members of a controlled group, such as defendants, be treated as a single employer means that plan trustees can operate as if defendants were one entity.... [therefore], [i]t is clear that notice and demand to one is notice and demand to all." *Id.* at 882. Although the *Connors* defendants did not seek the same judicially imposed limitation on Section 1301(b)(1), the court's interpretation of the statute as precluding a corporation-by-corporation analysis of issues under Title IV implicitly refutes Pepsi's argument that withdrawal liability calculations under § 1383 should be performed on a corporation-by-corporation basis.

### Reconciling § 1301(b)(1) With The MPPAA's Exemptions

Pepsi opposes the Fund's interpretation of the controlled group concept in theory and in practice. The court agrees with the Fund's initial proposition that § 1301(b)(1) applies to all withdrawal liability decisions under Title IV. However, the court finds that the Fund's application of this section to determine and calculate Pepsi's alleged withdrawal liability may have overemphasized the controlled group definition to the

---

the controlled group provision in its definition of multiemployer plans. *See* 29 U.S.C. § 1002(37)(B)(ii) (1974), *as amended,* 29 U.S.C. § 1002(37)(B).

**25.** The parties have not provided the court with any opinion letters which indicate the PBGC's interpretation of § 1301(b)(1) in the context of calculating withdrawal liability. With respect to the *determination* of a withdrawal, however, the agency articulated its position in PBGC Opinion Letter 82–13 (April 12, 1982), where it explained that the existence of a complete or partial withdrawal depended on the conduct of the entire group, not just one corporate member within the group.

exclusion of other significant provisions of the MPPAA. The Supreme Court recently emphasized that, "the assessment of withdrawal liability is not made in vacuum, ... but directly depends on the relationship between the employer and the plan to which it had made contributions.... [T]here are a significant number of provisions in the Act that moderate and mitigate the economic impact of an individual employer's liability." *Connolly v. PBGC,* — U.S. —, —, 106 S.Ct. 1018, 1026, 89 L.Ed.2d 166 (1986) (footnote omitted).

The MPPAA lists several types of contribution reductions which Congress determined should not constitute statutory withdrawals. For example, Sections 1383(b), (c) create statutory exemptions upon the happening of certain events in the building and construction industry and the entertainment industry; Section 1384 provides that a withdrawal does not occur as a result of a sale and subsequent cessation of covered assets or cessation of obligation to contribute to covered operations where the purchaser assumes the obligations to contribute to the plan; Section 1398(1) provides that a change in corporate structure where a successor continues to contribute to the plan is not a withdrawal; and Section 1398(2) provides that there is no withdrawal where an employer suspends contributions to a plan during a labor dispute with its employees. *See also* 29 U.S.C. § 1389(a) (de minimus rule); § 1405(a)(1) (liquidation of business limitation); § 1390(a)(2) ("free look" provision).

Each of these statutory exemptions reflect Congress' judgment that certain events should not be considered for the purpose of determining withdrawal liability under the MPPAA. The Pepsi group argues that the Fund's blind adherence to the controlled group concept to determine their withdrawal liability assessment cannot be reconciled with some of these statutory exemptions. It accuses the Fund of calculating withdrawal liability without offsetting contribution declines specifically sanctioned by ERISA and the MPPAA. The Fund asserts that the statutory exemptions are inapplicable in the controlled group con-

text, because § 1301(b)(1) requires the Fund to treat the controlled group as one entity, and to calculate its liability based on the entire group's decline in contributions. After analyzing the relevant statutory provisions, the court finds that the Fund has erred in its attempted extension of the controlled group concept to exclude consideration of these statutory exceptions. Title IV's statutory exemptions, like its controlled group provision, apply to all decisions regarding withdrawal liability under the MPPAA.

The MPPAA specifically provides that there can be no finding of withdrawal or assessment of liability based on the happening of certain statutorily defined events. These provisions notify *all* contributing businesses, regardless of whether they belong to a § 1301(b)(1) controlled group, of the types of contribution declines permissable under the statute. The court is unaware of any statutory provision—and the Fund has not cited any—which would limit the application of these exemptions to non-affiliated employers.

■ The Fund argues, however, that the controlled group definition obviates the need to consider the underlying events causing the group's contribution decline. This court disagrees. "A statute is passed as a whole and not in parts or sections.... Consequently, each part or section should be construed in connection with every other part or section so as to produce a harmonious whole.... [I]t is not proper to confine interpretation to the section to be construed." 2A Sutherland, Statutory Construction § 46.05 at 90 (4th Ed.1984). *See Ex Parte the Public National Bank of New York,* 278 U.S. 101, 104, 49 S.Ct. 43, 44, 73 L.Ed.2d 202 (1928); *Richards v. United States,* 369 U.S. 1; 11, 82 S.Ct. 585, 591, 7 L.Ed.2d 492 (1962); *Tak Cheong Hau v. Moyer,* 576 F.Supp. 844, 847 (N.D. Ill.1983); *Juvenile Products Manufacturers Ass'n, Inc. v. Edmisten,* 568 F.Supp. 714, 718 (E.D.N.C.1983). Absent any indication to the contrary, all businesses should be entitled to guide their conduct in

accordance with the specific exemptions provided by Congress. Therefore, the court finds that Section 1301(b)(1) should be interpreted consistent with these statutory exemptions. When determining the fact of a complete or partial withdrawal of a controlled group, the Fund should consider the conduct of the entire entity, but due allowance must be made for contribution declines stemming from a specific statutory exemption. Similarly, when calculating the entity's withdrawal liability, the Fund should not consider contribution declines caused by conduct which Congress has specifically exempted from liability.

When calculating the Pepsi group's liability, the Fund considered the group's entire contribution history, and may have failed to account for contribution declines which are attributable to conduct specifically exempted by the MPPAA. For instance, Pepsi alleges that the Fund's 1984 calculation includes the drop in contributions resulting from the sale of Lee-Way Motor Freight to Commercial Lovelace, Inc. If this sale satisfied the sale of assets exemption of Section 1384,[26] it would not constitute a statutory withdrawal, and no withdrawal liability should flow from it. *See* PBGC Opinion Letter No. 82-4 (Feb. 10, 1982) ("The legislative history of the Act ... indicates that there is no withdrawal liability solely as a result of a sale by a parent of a subsidiary which was obligated to contribute to a multiemployer plan and continues such contributions after the sale ..."). *See also* PBGC Opinion Letter 84-007 (Dec. 20, 1984).[27]

When assessing controlled group liability, the Fund must consider all the contribution declines of every member of the group except those specifically exempted by Congress. The Fund may argue that this interpretation of § 1301(b)(1) and the statutory exemptions impermissably dilutes the effect of the controlled group provision. This court disagrees. The court's interpretation of these provisions treats a "controlled group" employer like any other ERISA employer. For instance, if Pepsi-

---

**26.** This section provides, *inter alia:*

(1) A complete or partial withdrawal of an employer (hereinafter in this section referred to as the 'seller') under this section does not occur solely because as a result of a bona fide, arm's-length sale of assets to an unrelated party (hereinafter in this section referred to as the 'purchaser'), the seller ceases covered operations or ceases to have an obligation to contribute for such operations, if—

(A) the purchaser has an obligation to contribute to the plan with respect to the operations for substantially the same number of contribution base units for which the seller had an obligation to contribute to the plan;

(B) the purchaser provides to the plan for a period of 5 plan years commencing with the first plan year beginning after the sale of assets, a bond issued by a corporate surety company that is an acceptable surety for purposes of section 1112 of this title, or an amount held in escrow by a bank or similar financial institution satisfactory to the plan, in an amount equal to the greater of—

(i) the average annual contribution required to be made by the seller with respect to the operations under the plan for the 3 plan years preceding the plan year in which the sale of the employer's assets occurs, or

(ii) the annual contribution that the seller was required to make with respect to the operations under the plan for the last plan year before the plan year in which the sale of the assets occurs,

which bond or escrow shall be paid to the plan if the purchaser withdraws from the plan, or fails to make a contribution to the plan when due, at any time during the first 5 plan years beginning after the sale; and

(C) the contract for sale provides that, if the purchaser withdraws in a complete withdrawal, or a partial withdrawal with respect to operations, during such first 5 plan years, the seller is secondarily liable for any withdrawal liability it would have had to the plan with respect to the operations (but for this section) if the liability of the purchaser with respect to the plan is not paid....

29 U.S.C. § 1384(a).

**27.** There is an important statutory caveat which may apply to the Fund's assessment of liability for the sale of Lee Way. 29 U.S.C. § 1392(c) specifically provides that "[i]f a principal purpose of any transaction is to evade or avoid liability under this part, this part shall be applied (and liability shall be determined and collected) without regard to such transaction." *See* PBGC Opinion Letter No. 84-007 (Dec. 20, 1984) (interpreting this provision in the context of a sale of a subsidiary-member of a controlled group). The *Central States* complaint does allege that this improper motive triggered the sale of Lee Way in 1984. *See Central States, et al. v. Pepsi,* No. 85 C 9385 (¶¶ 31-34).

co's contributions declined because of a labor dispute within the meaning of 29 U.S.C. § 1398(2), it would be accorded the same treatment as a non-affiliated company experiencing a similar decline in contributions. On the other hand, if several members of the group experience unexcused declines in contributions, then the cumulative decline on the whole group's CBUs should be considered to determine whether the entire group withdrew. This application of the statute results in equal treatment of all ERISA "employers," whether they are a small company, a large company with several divisions, or a controlled group of corporations.

### Legislative History of Controlled Group Provision

Reference to the pertinent legislative history of ERISA and the MPPAA further reinforces this court's interpretation of Section 1301(b)(1) and its relationship to the withdrawal exceptions in the MPPAA. When Congress enacted ERISA in 1974, its overriding objective was to create a statutory scheme which would ensure the protection of an employee's vested pension benefits. *See generally* H.Rep. 93–533, 93rd Cong., 2d Sess., *reprinted in* 1974 U.S. Code Cong. & Admin. News 4639. Congress amended ERISA in 1980 because it concluded that ERISA failed to adequately protect the pension benefits of employees affiliated with multiemployer plans. *PBGC v. R.A. Gray & Co.*, 467 U.S. 717, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984). *See generally* H.Rep. No. 96–869, PART I, 96th Cong., 2d Sess. 52–57, *reprinted in* 1980 U.S. Code Cong. & Admin. News 2918, 2920–2926. It designed the MPPAA primarily to discourage withdrawals from multiemployer plans. In doing so, it also sought to structure the statutory scheme to avoid discouraging new entry into these plans. H.Rep. No. 96–869, PART II, 96th Cong., 2d Sess. 15, *reprinted in* 1980 U.S. Code Cong. & Admin. News 2993, 3004.

Congress considered the controlled group concept integral to the operation of ERISA's substantive provisions. The Senate Report explained:

> *Affiliated employers.*—The committee bill also provides that in applying the coverage test, as well as the antidiscrimination rules and the vesting requirements, employees of all corporations who are members of a "controlled group of corporations" (within the meaning of sec. 1563(a)) are to be treated as if they were employees of the same corporation. Thus, if two or more corporations were members of a parent-subsidiary, brother-sister, or combined controlled group, all of the employees of all of these corporations would have to be taken into account in applying these tests. The committee, by this provision, intends to make it clear that the coverage and antidiscrimination provisions cannot be avoided by operating through separate corporations instead of separate branches of one corporation.

S.Rep. No. 93–383, 93rd Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Admin.News 4890, 4928. The House Report echoed these sentiments. *See* H.Rep. No. 93–807, 93rd Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Admin.News 4670, 4716.

When the MPPAA was added six years later, Congress reaffirmed the importance of the controlled group provision. Senator Williams, the bill's sponsor, specifically endorsed the interpretation of this section articulated by the district court in *PBGC v. Ouimet*, 470 F.Supp. 945 (D.Mass.1979). 126 Cong.Rec. 23287 (August 26, 1980) (remarks of Sen. Williams). During the House debates, Representative Thompson commented, "[i]t is, of course, intended that the rules relating to the *determination* of withdrawal liability should be applied in a manner consistent with the controlled group concept." 126 Cong.Rec. 23028 (August 25, 1980) (remarks of Rep. Thompson) (emphasis supplied).

This court's literal interpretation of § 1301(b)(1) clearly supports Congress' objective of insuring American workers that their vested pension benefits will be avail-

able when they retire. *See PBGC v. Center City Motors, Inc.*, 609 F.Supp. 409, 413 (S.D.Cal.1984) ("the language of ERISA should be construed liberally to provide the maximum amount of protection to workers covered by pension plans."). Contrary to Pepsi's assertions, the court's interpretation of § 1301(b)(1) will not operate to deter new employers from entering multiemployer plans. In fact, this interpretation could promote entry, because it assures entering employers that, if a large conglomerate like Pepsi withdraws or significantly reduces its collective contributions to a multiemployer plan, it will not be able to foist the effects of its withdrawal on the remaining employers who still contribute to the plan. Thus, this interpretation does not upset Congress' "finely tuned balance" between discouraging withdrawals and promoting entry; it actually supports it.

The legislative background of ERISA and the MPPAA thus makes it abundantly clear that, for the purposes of these two statutes, Congress was unconcerned with the actual corporate form of a business. In promulgating the controlled group definition, Congress instructed the trustees, arbitrators, and the courts to disregard the corporate form and treat several interrelated corporations as one entity, the ERISA "employer." *PBGC v. Anthony Corp.*, 537 F.Supp. 1048, 1052 n. 6 (N.D.Ill.1982) ("... Section 1301(b)(1) ... reflect[s] a congressional concern that the realities of business organization should prevail over the formalities of corporate structure ..."); *See PBGC v. Center City Motors, Inc.*, 609 F.Supp. 409 (S.D.Cal.1984). Thus, this court concludes that the unequivocal language of § 1301(b)(1), reinforced by the statute's legislative history, firmly establishes Congress' intent that this definition apply to *all* decisions regarding withdrawal liability under Title IV of the MPPAA.

Congress' concomitant desire to exclude specific events from the scope of the MPPAA's withdrawal liability provisions is equally clear. The House Report explains:

A withdrawal would not occur, however, where an employer ceases to exist by reason of a change in form or structure, as long as the employer is replaced by a successor employer and there is no interruption in the employer's contributions to the plan or the employer's obligations under the plan. For example, if P corporation owns 100 percent of the stock of S corporation, a subsidiary that has an obligation to contribute to a multiemployer plan on behalf of its employees, the controlled group consisting of P and S would be considered an employer with an obligation to contribute to the plan. If P sells all of its interest in S to an unrelated party, the controlled group consisting of P and S would cease to exist. However, if S continues to have an obligation to contribute to the plan, no withdrawal would be considered to have taken place merely because of the change in ownership of S. In addition, a withdrawal would not take place merely because an employer suspends making plan contributions during a labor dispute which involves its employees.

H.Rep. No. 96–869, PART II, 96th Cong., 2d Sess. 16–17, *reprinted in* 1980 U.S.Code Cong. & Admin.News 2992, 3005–06. *See also* H.Rep. No. 96–869, PART I, 96th Cong., 2d Sess. 73–74, *reprinted in* 1980 U.S.Code Cong. & Admin.News 2918, 2942.

As the foregoing excerpt from the statute's legislative history indicates, Congress intended the statutory exemptions to apply to all withdrawal determinations, regardless of whether the employer in question was affiliated with a controlled group. This interpretation is consistent with that espoused by the PBGC in two opinion letters, Nos. 84–007 (Dec. 20, 1984), and 82–4 (Feb. 10, 1982).

The Seventh Circuit recently emphasized that, when enacting the MPPAA's withdrawal liability provisions, "Congress did not merely select a broad policy goal and instruct the courts to achieve that objective. Rather, Congress itself decided what rules, and exceptions to those rules, would best achieve its goals. The statutory language is the most reliable indicator of congressional intent." *Central States, South-*

*east and Southwest Areas Pension Fund v. Bellmont Trucking Co., Inc.,* 788 F.2d 428, 433 (7th Cir.1986). In this court's view, the only interpretation which fulfills the Congressional intent underlying the withdrawal liability provisions in Title IV is one that reconciles the controlled group provision with Title IV's statutory exemptions. Since it is this court's understanding that these exemptions were not considered when the Fund calculated the Pepsi group's withdrawal liability, the court instructs the Fund to recompute the withdrawal as liability assessments consistent with this opinion.

### Constitutionality of the Controlled Group Provision

Pepsi has launched a two-pronged attack on the validity of the controlled group provision: it alleges that the Fund's application of this provision results in a denial of due process [28] and a fifth amendment taking without just compensation.[29] However, the court finds that an analysis of both these arguments leads to the same ultimate conclusion: Congress' imposition of withdrawal liability on all members of a § 1301(b)(1) controlled group constitutes a legitimate exercise of legislative authority, and does not contravene any of the Pepsi group's constitutional rights.

### Due Process

"It is by now well established that legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and that the burden is on the one complaining of a due process violation to establish that the legislature acted in an arbitrary and irrational way." *Usery v. Turner-Elkhorn Mining Co.,* 428 U.S. 1, 15–16, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976). In *Peick v. PBGC,* 724 F.2d 1247, 1265–70 (7th Cir. 1983), *cert. denied,* 467 U.S. 1259, 104 S.Ct. 3554, 82 L.Ed.2d 855 (1984), the Seventh Circuit applied the *Usery* test to the withdrawal liability provisions of the MPPAA,

and concluded that the MPPAA's statutory scheme for determining and assessing withdrawal liability was neither arbitrary nor irrational.

The *Peick* court emphasized the extensive studies undertaken by Congress and the PBGC regarding the funding problems unique to multiemployer plans. *Id.* at 1266. Congress viewed the MPPAA's withdrawal liability provisions as "the most effective measure both to reduce an employer's incentives to withdraw from a multiemployer plan and to offset the burden otherwise shifted to the remaining employers when a withdrawal nevertheless occurs." *Peick,* 724 F.2d at 1267. The Peick court's assessment of the validity of the MPPAA's statutory scheme was unequivocal:

Congress acted rationally in choosing to try to forestall future pension crises involving millions of workers by essentially forcing withdrawing employers to fully fund future pension liabilities. Congress also did not act arbitrarily in fashioning the MPPAA to apply to plans which are currently financially stable as well as to plans in a more precarious financial state. The various moderating features of the MPPAA, such as exclusions from the definition of withdrawal, the partial exemption of certain industries and the *de minimis* exemptions, indicate that Congress attempted to impose the burdens of the legislation only to the extent necessary to achieve its legislative objective.

In sum, there is no indication that the congressional response to the problem of financial stability of multiemployer pension plans is either irrational or arbitrary. We have not sought to determine whether a different legislative scheme would be more effective or wiser—that question is not one of constitutional significance. *Turner Elkhorn Mining,* 428 U.S. at 19, 96 S.Ct. at 2894. Rather, we have determined that the MPPAA ration-

---

**28.** "No person shall ... be deprived of life, liberty or property, without due process of law...." U.S. Const. amend. V.

**29.** "... nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V.

ally furthers legitimate Congressional concerns and we thus find that the withdrawal liability provisions of the MPPAA do not contravene the due process clause of the Constitution.

*Id.* at 1268.[30]

■ Pepsi does not dispute the substance of the *Peick* decision; however, its due process challenge stems from the fund's use of the controlled group provision to determine and assess withdrawal liability. In order to prevail on this claim, Pepsi has the burden of establishing that the Congressional decision to treat all members of a controlled group as one ERISA employer was arbitrary and irrational. The court finds that Pepsi is unable to satisfy this burden.

First, the court notes that Congress clearly has the power to enact this provision. Pepsi cannot argue that Congress should be bound by the separate corporate identities of Pepsico and its subsidiaries. As the *Ouimet II* court explained,

> [The subsidiary's] corporate veil was, in effect, pierced by Congress when it enacted the termination liability provisions of ERISA. The corporate form is a creature of state law and states may impose stringent limitations on attempts to disregard it.... [T]hese limitations, however, do not constrict a federal statute regulating commerce for the purpose of effecting social policies.

711 F.2d 1085, 1093 (1st Cir.1983). *See also Sebastopol Meat Co. v. Sec'y of Agriculture,* 440 F.2d 983, 985 (9th Cir.1971); *Corn Products Refining Co. v. Benson,* 232 F.2d 554, 565 (2d Cir.1956).

Furthermore, the fact that Pepsi is not accused of engaging in the evil contemplated by the statute will not preclude application of § 1301(b)(1) to the Pepsi controlled group. *See Ouimet,* 470 F.Supp.

945, 955 (D.Mass.1979). The tax court recently rejected a similar argument in the context of 26 U.S.C. § 404(b), the I.R.C. parallel to ERISA § 1301(b)(1):

> [T]here simply is no statutory authority for conditioning the section's applicability on a requirement of 'manipulative purpose.' ... '[W]e are [not] free to pursue what is essentially a subjective corporate-level inquiry as an overall limitation on the scope of Section 414(b), for 'a legislative seeking to catch a particular abuse may find it necessary to cast a wider net.' *Comm'r v. Pepsi-Cola Niagara Bottling Corp.,* 399 F.2d 390, 392 (2d Cir.1968).

*Fujinon Optical, Inc. v. Comm'r,* 76 T.C. 499, 505–06 (1981). *See also Mourning v. Family Publications Service, Inc.,* 411 U.S. 356, 374, 93 S.Ct. 1652, 1663, 36 L.Ed.2d 318 (1973).

Reference to the statute's legislative history indicates that Congress drafted this provision in response to the existing discriminatory practices used by employers when constructing their pension plans. *See* H.Rep. No. 93–807, 93rd Cong.2d Sess., *reprinted in* 1974 U.S.Code Cong. & Admin.News 4670, 4716. "When Congress defined all members of a controlled group as a single 'employer,' it clearly intended to prevent a business from limiting its responsibilities under ERISA by the fractionalization of its business operations." *PBGC v. Center City Motors, Inc.,* 609 F.Supp. 409, 412 (S.D.Cal.1984). Additionally, Congress recognized that this provision would preclude solvent employers from attempting to shift the responsibility to continue funding the pension plan to the government (PBGC) or the plan itself. *See In re Challenge Stamping & Porcelain Co.,* 719 F.2d 146,

---

**30.** The *Peick* court's rationale for rejecting the plaintiff's due process challenge was based primarily on Congress' examination of the problems that multiemployer pension plans had experienced subsequent to ERISA. *See Peick,* 724 F.2d at 1266–68. The court concluded: "We have determined that the MPPAA rationally furthers legitimate Congressional concerns and we thus find that the withdrawal liability provisions of the MPPAA do not contravene the due process clause of the constitution." *Id.* at 1268.

Although it is not challenged in the present case, it is noteworthy that the Seventh Circuit also upheld the retroactive aspect of the MPPAA as consistent with Due Process. *Id.* at 1269.

151 (6th Cir.1983).[31] Six years later, when Congress enacted the MPPAA, it re-affirmed its support for the application of the controlled group provision in all withdrawal decisions under Title IV.

In light of the congressional concerns which motivated the promulgation of Section 1301(b)(1), Pepsi cannot seriously argue that the Congressional solution to these problems was arbitrary or irrational. The importance of this provision in the context of ERISA's statutory scheme was underscored in *PBGC v. Ouimet,* 470 F.Supp. 945, 955 (D.Mass.1976):

> One purpose of ERISA is to supplement and enforce federal labor law by preventing employers from promising more than they can deliver by way of benefits when negotiating collective bargaining agreements. The employer liability provisions of Title IV directly serve the primary goal of the pension reform effort, the voluntary continuation and maintenance of private pension plans. Application of the controlled group liability theory fosters that purpose by preventing employers from using corporate segmentation as a shield from termination liability. The statute reflects Congress' judgment that, without controlled group liability, businesses could juggle their activities to eviscerate the termination liability provisions of ERISA. Such prophylactic legislation is valid when applied indiscriminately on an across-the-board basis.

(footnote omitted). This rationale is no less valid in the context of multiemployer plans. In order to effectively implement the MPPAA's withdrawal liability provisions, Congress had to insure that withdrawal liability could not be avoided through the creative shifting of business operations. Its selection of the controlled group concept is an effective and reasonable means of achieving that goal.

Finally, the court rejects Pepsi's claim that controlled group liability, as applied to the members of the Pepsi controlled group, produces arbitrary and irrational results. Pepsi does not explain why Pepsico and its subsidiaries should be exempt from the reach of § 1301(b)(1). The thrust of its constitutional argument focuses on the Fund's interpretation of § 1301(b)(1) as controlling all decisions regarding withdrawal under the MPPAA. Following this court's interpretation of the interrelationship between § 1301(b)(1) and Title IV's statutory exemptions, however, the Pepsi group will be liable only for the cumulative decline in the group's CBUs. The determination and calculation of liability will include all contribution declines which are not specifically exempted by other provisions within Title IV. Even if this calculation produces a withdrawal liability assessment greater than that obtained by treating the members on a corporation-by-corporation basis, this fact alone will not render the resulting assessment constitutionally infirm, for Pepsi has not established, nor can it establish, its right to be treated on that basis.

When Congress passed the MPPAA, it sought to curb withdrawals which would have a significant effect on a pension plan and its ability to provide promised benefits. Congress ameliorated the potentially harsh

---

**31.** Pepsi places a great deal of reliance on the fact that the *Challenge Stamping* court did not impose withdrawal liability on the "controlled group" in question. A review of this decision demonstrates that this reliance is without foundation. The *Challenge Stamping* court did not impose withdrawal liability because the bankruptcy code precluded the employer in question from controlling the bankrupt corporation. *In re Challenge Stamping & Porcelain Co.,* 719 F.2d 146, 151 (6th Cir.1983). The court held:

> Congress sought to determine the plan fact of control, rather than any subjective motives or reasons for control or relinquishment of control.... It seems apparent that by this objective test to determine common control, Congress was seeking to place responsibility (and liability) upon the party actually in control so as to insure that control would be exercised responsibly and for proper reasons.... The purpose of the ... regulation is obviously to find the party *in control.* Where, by operation of the bankruptcy law, a party is actually denied control, there is no reason to apply the regulation.

*Id.* (emphasis in original). Pepsico has not argued that it has no control over the subsidiaries in question. In light of this fact, its reliance on *Challenge Stamping* is unfounded.

consequences of an assessment for all declines by specifically excluding certain events from withdrawal liability. *Peick,* 724 F.2d at 1268, 1273–74, 1271, n. 30. *See also Connolly v. PBGC,* ⸺ U.S. ⸺, 106 S.Ct. 1018, 1026, 89 L.Ed.2d 166 (1986); *Republic Industries, Inc. v. Teamsters Joint Council,* 718 F.2d 628, 640 (4th Cir. 1983), *cert. denied,* 467 U.S. 1259, 104 S.Ct. 3553, 82 L.Ed.2d 855 (1984); *Dorn's Transportation, Inc. v. I.A.M. National Pension Fund,* 578 F.Supp. 1222, 1230 (D.D.C.1984), *aff'd,* 753 F.2d 166 (D.C.Cir.1985); *Textile Workers Pension Fund v. Standard Dye & Finishing Co.,* 725 F.2d 843, 854 (2d Cir.), *cert. denied,* 467 U.S. 1259, 104 S.Ct. 3554, 82 L.Ed.2d 856 (1984). When the members of a group of corporations with a common owner take actions which place the entire group with the definition of a withdrawal, then the conduct of that entire group has a significant effect on the overall financial stability of the plan. It is not irrational for Congress to characterize all businesses with a common parent as one ERISA employer, and declare that each member should be responsible for the detrimental effects of his "family's" conduct on the overall stability of the fund. What Pepsi characterizes as an "inflated figure" is actually just a reflection of the whole group's proportional share of the fund's unfunded vested liability. The fact that a lesser result could have been reached by treating the group on a corporation-by-corporation basis does not mean that the procedure that Congress selected to alleviate this problem is arbitrary or irrational. *Peick, supra* at 1268.[32] The court concludes that it was unquestionably rational for Congress to devise the withdrawal liability system to require a withdrawing employer to fund his proportional share of the fund's unfunded vested liabilities. Insertion of the controlled group concept into the basic theorem does not upset this rationality.[33]

## Taking of Property

■ The Pepsi group also alleges that use of the controlled group definition in the determination and calculation of their withdrawal liability constitutes an unconstitutional taking of property without just compensation. Although taking claims involve a slightly different analysis than that employed in a due process claim, both claims address the same underlying considerations. *Connolly v. PBGC,* ⸺ U.S. ⸺, 106 S.Ct. 1018, 1025, 89 L.Ed.2d 166 (1986) ("Although both [*PBGC v. R.A.*] *Gray* [*& Co.,* 467 U.S. 717, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984) ] and [*Usery v.*] *Turner-Elkhorn* [*Mining Co.,* 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976) ] were due process cases, it would be surprising indeed to discover now that in both cases Congress unconstitutionally had taken the assets of the employers there involved."). In *Connolly,* the Supreme Court recently considered and rejected the claim that "the imposition of non-contractual withdrawal liability violates the Taking Clause of the Fifth Amendment by requiring employers to transfer their assets for the private use

**32.** As the *Peick* court emphasized,
[W]e are not to evaluate whether Congress chose the 'best' solution to a given problem. Our role is simply to evaluate *rationality,* ... [and] that evaluation must be based on proper deference to the decision of the legislature. There is certainly a burden imposed on employers by the MPPAA. But what would be the alternative burden on workers entering into retirement with underfunded or non-existent pensions? Congress has the primary task of equitably distributing the burden of underfunded pensions, and we cannot say that Congress' choice is an inequitable one.
*Peick,* 724 F.2d at 1273 (citations omitted).

**33.** When devising the withdrawal liability provisions of the MPPAA, Congress sought to create a scheme whereby "an employer withdrawing from a multiemployer would be required to complete funding its fair share of the plan's unfunded liabilities." *Connolly v. PBGC,* ⸺ U.S. ⸺, 106 S.Ct. 1018, 1022–23, 89 L.Ed.2d 166 (citations omitted). Thus, the Act "safeguards the [remaining] participants in multiemployer pension plans by requiring a withdrawing employer to fund its share of the plan obligations incurred during its association with the plan." *Connolly,* 106 S.Ct. at 1026. Pepsi's objections center only on the treatment of Pepsico and its subsidiaries as one ERISA employer. The group has never alleged that, assuming they must be treated as one employer, the amount assessed is disproportionate to the sum total of their entire group's promised employee benefits.

of pension trusts and, in any event, by requiring an uncompensated transfer." *Connolly*, 106 S.Ct. at 1024. (footnote omitted).[34]

The Court refuted the validity of Connolly's taking claim on several grounds. First, it noted that Congress clearly has the power to regulate pension plans, and "[i]n the course of regulating commercial and other human affairs, Congress routinely creates burdens for some that directly benefit others." 106 S.Ct. at 1025. However, the taking clause is not violated merely because Congress requires one person to use his or her assets for another. " 'Legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations.... This is true even though the effect of the legislation is to impose a new duty or liability based on past acts.' " *Connolly*, 106 S.Ct. at 1025, *citing Usery v. Turner-Elkhorn Mining Company*, 428 U.S. 1, 15–16, 96 S.Ct. 2882, 2893, 49 L.Ed.2d 752 (1976) (citations omitted).

Second, the court held that a contractual provision which purports to limit an employer's contributions could not preclude an assessment of liability on a withdrawing employer. The Court concluded, "[i]f the regulatory statute is otherwise within the powers of Congress, ... its application may not be defeated by private contractual provisions. For the same reason, the fact that legislation disregards or destroys existing contractual rights does not always transform the regulation into an illegal taking." *Connolly*, 106 S.Ct. at 1025.

Finally, the Court held that its rejection of the petitioner's taking claim was fully consistent with its previous taking cases. The Court listed three factors of "particu-

lar significance" in assessing the validity of a party's fifth amendment taking claim:

(1) 'The economic impact of the regulation on the claimant';

(2) 'The extent to which the regulation has interfered with district investment-backed expectations'; and

(3) 'The character of the governmental action.'

*Connolly*, 106 S.Ct. at 1026, *citing Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978).

With respect to the first factor, the Court conceded that the Act deprives an employer of "the amount of money it is obligated to pay to fulfill its statutory liability." *Connolly*, 106 S.Ct. at 1026. It held, however, that "There is nothing to show that the withdrawal liability actually imposed on an employer will always be out of proportion to its experience with the plan, and the mere fact that the employer must pay money to comply with the Act is but a necessary consequence of the MPPAA's regulatory scheme." *Id.* (footnote omitted).

Similarly, the Court rejected the employer's claim that the Act interfered with its legitimate-investment backed objectives. The employers had argued that the terms of their collective bargaining agreement should set the framework for determining whether the Act upsets their legitimate expectations. The Supreme Court rejected this argument as failing to account for the fact that

Pension plans, ... were the objects of legislative concern long before the passage of ERISA in 1974, and surely as of that time, it was clear that if the PBGC exercised its discretion to pay benefits upon the termination of a multiemployer

---

**34.** In *Connolly,* the Court also questioned whether MPPAA actually "takes" anything "for public use." It held:

This is not to say that contract rights are never property rights or that the government may always take them for its own benefit without compensation. But here, the United States has taken nothing for its own use, and only has nullified a contractual provision lim-

iting liability by imposing an additional obligation that is otherwise within the power of Congress to impose. That the statutory withdrawal liability will operate in this manner and will redound to the benefit of pension trusts does not justify a holding that the provision violates the Taking Clause and is invalid on its face.

106 S.Ct. at 1026.

pension plan, employers who had contributed to the plan during the preceding five years were liable for their contributions during that period.... It was also plain enough that the purpose of imposing withdrawal liability was to ensure that employees would receive the benefits promised them. When it became evident that ERISA fell short of achieving that end, Congress adopted the 1980 amendments. Prudent employers then had more than sufficient notice not only that pension plans were currently regulated, but also that withdrawal itself might trigger additional financial obligations.... 'Those who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end.'

*Connolly*, 106 S.Ct. at 1027, *citing F.H.A. v. The Darlington, Inc.*, 358 U.S. 84, 91, 79 S.Ct. 141, 146, 3 L.Ed.2d 132 (1958) (other citations omitted).

The Supreme Court dismissed the final factor with little comment:

[W]ith respect to the nature of the governmental action, we already have noted that, under the Act, the Government does not physically invade or permanently appropriate any of the employer's assets for its own use. Instead, the Act safeguards the participants in multiemployer pension plans by requiring a withdrawing employer to fund its share of the plan obligations incurred during its association with the plan. This interference with the property rights of an employer arises from a public program that adjusts the benefits and burdens of economic life to promote the common good and, under our cases, does not constitute a taking requiring Government compensation.

*Id.* at 1026.

In a concurring opinion, Justice O'Connor emphasized that the Court's analysis was limited to the facial validity of the statute,

and that situations could arise in which the Act, as applied, "may be arbitrary and irrational in the absence of any connection between the employer's conduct and some detriment to the employee." *Connolly*, 106 S.Ct. at 1028 (O'Connor, J., concurring).

Pepsi does not even attempt to fit its taking claim into the confines of the *Connolly* Court's three-pronged analysis of these claims. Indeed, such an attempt would have been futile, for the Court's assessment of the statute effectively forecloses Pepsi's taking claim. The inclusion of the controlled group concept into the court's analysis would lead this court to the same conclusions rendered by the *Connolly* Court with respect to the general withdrawal liability provisions.[35]

Pepsi cites *Connolly* for only one proposition: that the Fund's proposed application of the controlled group definition produces "extremely harsh" results analogous to those foreseen by Justice O'Connor in her concurring opinion. This claim fares no better than Pepsi's due process claim. Pepsi has not shown how its withdrawal liability creates the "drastic case" that Justice O'Connor worries about. In *Connolly*, the court was unconcerned about the fact that the assessment in question approximated 25% of the employer's net worth. Pepsi has presented no information indicating whether its assessment comes anywhere near this percentage of the entire group's net worth. Accordingly, its bald assertions of unfairness must be rejected. As set forth in detail above, the court finds its interpretation of § 1301(b)(1) is both constitutionally sound and reflective of the proper interpretation of Congress' approach to legislation of multiemployer pension plans.

As the court stated earlier, there is no due process violation merely because Congress has chosen to "pierce the corporate veil" and treat a group of businesses under common control as one entity, the ERISA "employer." Treatment of employers in

---

**35.** The Seventh Circuit rejected a similar "taking" claim with little discussion in *Peick v. PBGC*, 724 F.2d 1247, 1274–76 (7th Cir.1983), *cert. denied*, 467 U.S. 1259, 104 S.Ct. 3554, 82 L.Ed.2d 855 (1984).

this manner is a rational means of achieving a valid Congressional objective. *See Ouimet,* 470 F.Supp. 945, 955 (D.Mass. 1979). The court cannot determine whether the allegedly "harsh" results stemming from the fund's withdrawal liability assessments will be ameliorated by the amended calculation of withdrawal liability ordered in the earlier portions of this opinion. This issue is not dispositive, however, because the Supreme Court's decisions regarding the constitutionality of the MPPAA are unaffected by the inclusion of the controlled group issue into the debate. Congress' statutory scheme, as ordered by this court, fully satisfies the requirements of the fifth amendment due process and taking clauses.[36]

### Constitutionality of the MPPAA's Withdrawal Liability Scheme

In addition to their statutory and constitutional claims regarding the Fund's use of the controlled group provision, the defendants' amended answer and counterclaims also alleges a host of related constitutional violations stemming from the Fund's assessment of withdrawal liability against the Pepsi controlled group. These claims address virtually every constitutional clause presently litigated in the federal courts. Pepsi clearly has standing to raise these claims in federal court, and to seek declaratory relief from the Fund's liability assessment which purportedly contravenes its constitutional rights. *See Time-DC, Inc. v. New York State Teamsters Conference,* 580 F.Supp. 621 (N.D.N.Y.), *aff'd,* 735 F.2d 60 (2d Cir.1984); *Time-DC, Inc. v.*

*Trucking Employees of North Jersey Welfare Fund, Inc.,* 560 F.Supp. 294 (E.D.N.Y. 1983). Although some of Pepsi's constitutional claims raise more troublesome issues, the court finds that several of these claims must be dismissed outright, based on two recent Supreme Court decisions and the Seventh Circuit's decision in *Peick v. Pension Benefit Guaranty Corp. (PBGC),* 539 F.Supp. 1025 (N.D.Ill.1982), *aff'd,* 724 F.2d 1247 (7th Cir.1983), *cert. denied,* 467 U.S. 1259, 104 S.Ct. 3554, 82 L.Ed.2d 855 (1984). These opinions contain exhaustive analyses of the role of the MPPAA and the constitutionality of several of its provisions at issue in this case.

### Impairment of Contract

▐ Pepsi's constitutional claims address the Fund's proposed method of computation and collection of the alleged withdrawal liability, as well as the constitutionality of certain provisions unaffected by application of § 1301(b)(1). As set forth earlier, the court finds that the Fund's interpretation of the controlled group provision, as modified by the court, is both constitutionally sound and consistent with congressional intent.

Pepsi has also asserted several claims challenging the impact of a withdrawal liability assessment on its contract relations. It appears to argue that legislation which purports to override the contribution limits contained in its collective bargaining agreements violates the contract clause of the constitution. *See* U.S. Const. art. I, § 10. In *Peick v. PBGC,* 724 F.2d 1247 (7th Cir. 1983), *cert. denied,* 467 U.S. 1259, 104 S.Ct.

---

**36.** The court's conclusions regarding Pepsi's due process and taking claims also dispose of Pepsi's seventeenth counterclaim, which alleges that the Fund violated these two constitutional provisions by "applying actuarial assumptions and interest rates which do not minimize to the greatest extent possible the withdrawal liability demanded from counterclaimants." (Amended Answer and Counterclaims ¶ 87). Pepsi filed an affidavit of one of its co-counsel, William J. Vesely, Jr. in support of this claim. Vesely states that the Trustees' computation of the Fund's unfunded vested liabilities utilized interest rates lower than those established by the PBGC, and "had the higher PBGC interest rates been applied, the difference between the value

of the assets and the vested liabilities of the Fund, the so-called 'unfunded vested liabilities,' which are the basis for assessing withdrawal liability against Pepsi-Cola and Pepsico, would have been substantially reduced and defendants' alleged withdrawal liability would have been significantly lower than is claimed by the Fund." Affidavit of William J. Vesely, Jr. ¶ 4.

Pepsi has not demonstrated any *right* to the minimization of liability that it seeks in this counterclaim. In any event, if Pepsi desires to take issue with the interest rates utilized by the Trustees in calculating its withdrawal liability, it will have the opportunity to challenge these allegedly improper assumptions and interest rates in arbitration.

3554, 82 L.Ed.2d 855 (1984), the Seventh Circuit held that federal legislation which affects a party's contractual relations is properly analyzed under the due process clause of the fifth amendment, not the contract clause.[37] The validity of this conclusion was ratified in two recent Supreme Court decisions. In *PBGC v. R.A. Gray & Co.*, 467 U.S. 717, 104 S.Ct. 2709, 2719–20, 81 L.Ed.2d 601 (1984), the Supreme Court rejected the claim that a stricter contract clause analysis should be applied to these claims. It held that the "arbitrary and capricious" standard which governs due process inquiries in economic legislation applies with equal force to constitutional claims alleging an impairment of contract. *Id.* The Court noted that its previous decisions, as well as the historical background of the contract clause, negated any inference that this constitutional provision should apply to actions of the national government. *Gray*, 104 S.Ct. at 2719 n. 9, 2720. Recently, the Supreme Court reiterated this position in *Connolly v. PBGC*, —— U.S. ——, 106 S.Ct. 1018, 1025, 89 L.Ed.2d 166 (1986):

> contracts, however express, cannot fetter the constitutional authority of Congress. Contracts may create rights of property, but when contracts deal with a subject matter which lies within the control of Congress, they have a constitutional infirmity. Parties cannot remove their transactions from the reach of dominant constitutional power by making contracts about them.

*citing Norman v. Baltimore & Ohio R. Co.*, 294 U.S. 240, 307–08, 55 S.Ct. 407, 415–16, 79 L.Ed. 885 (1935).

Applying the "arbitrary and irrational" test, the *Peick* court held that if there is any "impairment" resulting from the imposition of withdrawal liability, it is not an infringement of constitutional dimension. The Court concluded that the creation of withdrawal liability was a rational method of combating the social ills that Congress sought to eliminate. Therefore, the fact that these provisions might conflict with certain privately agreed-upon contractual limitations would not render the MPPAA constitutionally infirm. *Peick*, 724 F.2d at 1262–70. Given the Seventh Circuit's decision in *Peick*, the court finds that Pepsi's thirteenth counterclaim, which alleges unconstitutional interference with the obligation of contracts and due process, and its twelfth affirmative defense and seventh counterclaim, which alleges that the MPPAA unconstitutionally alters its contractual obligations in collective bargaining agreements, must be dismissed.

### Equal Protection

The *Peick* plaintiffs raised an equal protection claim, which was rejected by the district court, and apparently was not appealed to the Seventh Circuit. They argued that the MPPAA imposes a heavier burden on employers contributing to multiemployer trusts, thereby creating an unconstitutional classification between these employers and employers contributing to single employer trusts. *Peick*, 539 F.Supp. 1025, 1056. The district court cogently explained the constitutional standard, and upheld the MPPAA's "classification" as rational and consistent with Congress' legitimate objectives. *Id.* at 1057–59. It stated:

> Plaintiffs have never argued that these distinctions run along 'suspect' lines or that they impinge upon 'fundamental rights' as that term is understood in the

---

**37.** "No state shall ... pass any ... law impairing the obligation of contracts...." U.S. Const. art. I, § 10. The *Peick* court reasoned:

> The contract clause, on its face, applies only to laws passed by *states*. ... [N]o Supreme Court case has yet held, or even suggested, that the contract clause is directly applicable to legislation of the federal government.... Our review of due process clause and the contract clause jurisprudence convinces us that these two constitutional provisions are by

no means coextensive and rightly must be considered distinct.... A wholesale and uncritical application of the contract clause to federal regulation would presumably result in the fundamental alteration of the role which the federal judiciary has played in the review of federal social welfare and economic legislation.

*Peick*, 724 F.2d at 1263, 1264 (emphasis in original).

equal protection context. This being the case, plaintiffs can succeed only upon a showing that Congress has acted in a 'patently arbitrary or irrational way.' *U.S. Railroad Retirement Bd. v. Fritz,* 449 U.S. 166, 177 [101 S.Ct. 453, 460, 66 L.Ed.2d 368] (1980).... As the Supreme Court recently explained:

> Social and economic legislation ... that does not employ suspect classifications or impinge on fundamental rights must be upheld against equal protection attack when the legislative means are rationally related to a legitimate governmental purpose. Moreover, such legislation carries with it a presumption of rationality that can only be overcome by a clear showing of arbitrariness and irrationality. As the Court explained in *Vance v. Bradley,* 440 U.S. 93, 97 [99 S.Ct. 939, 942, 59 L.Ed.2d 171] (1979), social and economic legislation is valid unless 'the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that [a court] can only conclude that the legislature's action were irrational.' This is a heavy burden....

*Hodel v. Indiana,* 452 U.S. 314, 331–32 [101 S.Ct. 2376, 2387, 69 L.Ed.2d 40] (1981) (citations omitted)....

> Withdrawal liability is a debt owed to the plan which has been abandoned. *See* 29 U.S.C.A. § 1383(a) (Supp.1981). Single employer termination liability is payable to the PBGC. *See* 29 U.S.C. § 1362(b) (1976). In both contexts, therefore, Congress imposed the duty of calculation and collection upon the party to whom the debt runs. Congress rationally treated similarly situated entities, and did not violate the norm of equal protection.

*Peick,* 539 F.Supp. at 1057. *See also Id.* at 1057–59. This court agrees with the District Court's analysis and conclusion regarding any equal protection challenge levelled against the MPPAA. Therefore, the court finds that Pepsi's fifteenth affirmative defense and tenth counterclaim, which alleges that the MPPAA establishes an impermissable classification of employers in violation of the equal protection clause, must be dismissed.

### Ex Post Facto Laws

The *Peick* plaintiffs also argued that the MPPAA's treatment of withdrawals between April 29, 1980 and September 26, 1980 constituted an ex post facto law because it penalized the Fund trustees for failing to collect a liability fixed by events preceding the statutes enactment. *Peick,* 539 F.Supp. at 1035 n. 14. The district court dismissed this argument in a footnote:

> The trustees' ex post facto argument is also without merit. In the first place, MPPAA is not retrospective with respect to these parties. They are subject to suit for breach of fiduciary duty only if they fail to collect a withdrawal liability in the period *following enactment.* This fact alone is fatal to their argument.

*Id.* at 1056 n. 81. Pepsi's ex post facto claim differs from the claim rejected in *Peick,* however, because it alleges that the withdrawal liability assessment is attributable in part to certain reductions in contributions which occurred prior to September 26, 1980, the date on which the MPPAA was enacted, and therefore, imposition of this withdrawal liability for such reductions is "an impermissible retroactive application of MPPAA ... [and constitutes] an ex post facto law in violation of Article I of the United States Constitution. (Sixteenth Affirmative Defense and Eleventh Counterclaim, ¶¶ 72–73). Although the claims differ, the court finds that the *Peick* court's analysis disposes of this claim as well.

■ The United States Constitution provides that "No Bill of Attainder or ex post facto law shall be passed." U.S. Const. Art. I, § 9. The ex post facto clause precludes federal and state governments from punishing persons for actions which were not illegal when performed. J. Nowak, R. Rotunda, J. Young, Constitutional Law 412 (2d Ed.1983). The Supreme Court has long held that the ex post facto clause only prohibits states and the federal government from passing *criminal or penal* mea-

sures with a retroactive effect. *Id.* at 477. *See Calder v. Bull,* 3 U.S. (3 Dall. 386, 390, 397, 1 L.Ed. 648 (1878)). *See also Weaver v. Graham,* 450 U.S. 24, 29 n. 13, 101 S.Ct. 960, 964 n. 13, 67 L.Ed.2d 17 (1981) ("Ex post facto analysis ... is concerned solely with whether a statute assigns more disadvantageous criminal or penal consequences to an act than did the law in place when the act occurred."). The Pepsi group has never explained how this regulatory act, as written or as applied, constitutes an ex post facto law violative of the constitution. *See generally Agustin v. Quern,* 461 F.Supp. 441, 443–45 (N.D.Ill.1978), *aff'd,* 611 F.2d 206, 211 (7th Cir.1979); *United States v. Nasser,* 476 F.2d 1111, 1117 (7th Cir.1973). The challenged sections of ERISA and the MPPAA are neither criminal nor penal in nature; they are remedial provisions designed to protect the vested rights of workers covered by a given pension plan. Therefore, the court concludes that the Fund's use of pre-1980 reductions to calculate withdrawal liability does not, in itself, constitute a practice violative of the ex post facto clause of the constitution.[38]

### Void-For-Vagueness

The Pepsi defendants, like the *Peick* plaintiffs, also seek to invalidate certain provisions of the MPPAA on the ground that they are "void-for-vagueness." Although the challenged sections differ from those considered in *Peick,* the *Peick* court's analysis of the void-for-vagueness doctrine in the context of the MPPAA ultimately leads this court to the same conclusion.

The *Peick* court articulated the burden that a party must overcome in order to establish the unconstitutionality of a statute on vagueness grounds:

> *Village of Hoffman Estates v. Flipside,* 455 U.S. 489 [102 S.Ct. 1186, 71 L.Ed.2d 362] (1982), establishes a very heavy burden for a party seeking to have a federal regulatory statute declared void for vagueness in a facial challenge. In a facial challenge, 'the complainant must demonstrate that the law is impermissibly vague in all of its applications.' 455 U.S. at 497 [102 S.Ct. at 1193].

*Peick,* 724 F.2d at 1276. The court then dismissed plaintiffs' claims, noting that they had not even *attempted* to demonstrate the alleged vaguaries of the challenged provisions. *Id. See also Peick,* 539 F.Supp. 1025, 1059 (N.D.Ill.1982) ("The [party] must do more than establish that the statutory standard of conduct is imprecise; [he] must show that the statute specifies no standard at all.") (citations omitted).

The Pepsi defendants' seventeenth affirmative defense and twelfth counterclaim alleges that "the provisions of the MPPAA, including but not limited to, § 4213 (29 U.S.C. § 1393),[39] pertaining to the actuarial

---

**38.** In *Washington Star Co. v. International Typographers Union Negotiated Pension Plan,* 729 F.2d 1502, 1510 (D.C.Cir.1984), the court explained:

> The cost allocation problem addressed by the MPPAA is one of enormous difficulty. Not even the total amount of a plan's underfunding is known until the plan terminates or becomes insolvent. It is clearly rational, however, to assess and begin to collect an individual employer's liability immediately at the time of its withdrawal, even though the plan itself may be on-going. The Star specifically criticizes Congress' solution to the problem of cost assessment and allocation on the ground that it imposes liability for the large accumulations of pre-MPPAA underfunding only upon the group of employers who were contributing to multiemployer plans as of April 29, 1980. Employers who withdrew from multiemployer plans before that date are assessed no liability. Employers who did

not begin contributing to a plan until after that date are liable only for their proportionate share of the changes in unfunded vested liability during each plan year in which they contribute. But Congress clearly had a rationale for choosing the solution it did. Congress could not have imposed liability on employers who withdrew before April 29, 1980, without substantially increasing the MPPAA's retroactive effect. And Congress could not have imposed liability for pre-MPPAA underfunding on employers who began contributing to a plan subsequent to the enactment of the MPPAA without discouraging new entrants to multiemployer plans and thus defeating the MPPAA's purpose.

**39.** ¶ 29 U.S.C. § 1393 provides:

> **(a) Use by plan actuary in determining unfunded vested benefits of plan for computing withdrawal liability of employer**

assumptions used in computing the withdrawal liability of an employer, are unconstitutionally vague and ambiguous in that men of ordinary intelligence must guess as to the meaning of the language and could differ as to the statute's interpretation." (Amended Answer and Counterclaims, ¶ 74).

In *Village of Hoffman Estates v. Flipside*, 455 U.S. 489, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982), the Supreme Court noted the difficulty of invalidating statutes regulating economic conduct. It reasoned:

> [E]conomic regulation is subject to a less strict vagueness test because its subject-matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action. Indeed, the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process.

*Id.* at 498, 102 S.Ct. at 1193. Thus, in order to invalidate economic statutes on vagueness grounds, the complainant must establish that the challenged law is "impermissably vague in all its applications." *Id.* at 497, 102 S.Ct. at 1193.

Aside from the conclusory allegations in its answer and counterclaims, Pepsi has not presented any cogent arguments regarding the alleged vagueness of Section 1393. Without the inclusion of some actuarial assumptions, calculation of withdrawal liability would be difficult, if not impossible, to accomplish. The inclusion of actuarial assumptions in the withdrawal liability calculation does not, as if by magic, place an incomprehensible fog over the calculation of withdrawal liability. Additionally, the statutory provisions which enable withdrawing employer to challenge these assumptions further undermines Pepsi's vagueness claim with respect to Section 1393. *See* 29 U.S.C. §§ 1399, 1401. To this court's knowledge, every court that has considered the vagueness argument with respect to § 1393 has upheld its constitutionality. *See, e.g., Terson Co. v. Bakery Drivers & Salesmen Local 194*, 739 F.2d 118, 121 (3d Cir.1984); *Textile Workers Pension Fund v. Standard Dye and Finishing Co.*, 725 F.2d 843 (2d Cir.), *cert. denied*, 467 U.S. 1259, 104 S.Ct. 3554, 82 L.Ed.2d 856 (1984); *Republic Industries v. Teamsters Joint Council*, 718 F.2d 628, 643 (4th Cir.1983), *cert. denied*, 467 U.S. 1259, 104 S.Ct. 3553, 82 L.Ed.2d 855 (1984). Accordingly, the court hereby dismisses Pepsi's vagueness challenge to Section 1393 of the MPPAA.[40]

The corporation may prescribe by regulation actuarial assumptions which may be used by a plan actuary in determining the unfunded vested benefits of a plan for purposes of determining an employer's withdrawal liability under this part. Withdrawal liability under this part shall be determined by each plan on the basis of—
(1) actuarial assumptions and methods which, in the aggregate, are reasonable (taking into account the experience of the plan and reasonable expectations) and which, in combination, offer the actuary's best estimate of anticipated experience under the plan, or
(2) actuarial assumptions and methods set forth in the corporation's regulations for purposes of determining an employer's withdrawal liability.
**(b) Factors determinative of unfunded vested benefits of plan for computing withdrawal liability of employer**
In determining the unfunded vested benefits of a plan for purposes of determining an employer's withdrawal liability under this part, the plan actuary may—

(1) rely on the most recent complete actuarial valuation used for purposes of section 412 of Title 26 and reasonable estimates for the interim years of the unfunded vested benefits, and
(2) in the absence of complete data, rely on the data available or on data secured by a sampling which can reasonably be expected to be representative of the status of the entire plan.
**(c) Determination of amount of unfunded vested benefits**
For purposes of this part, the term 'unfunded vested benefits' means with respect to a plan, an amount equal to—
(A) the value of nonforfeitable benefits under the plan, less
(B) the value of the assets of the plan.

**40.** The defendants also allege that other unnamed sections of the MPPAA are also void for vagueness. They present no argument in support of this contention, and do not even specify which additional sections they might seek to

### Mandatory Arbitration

Pepsi's amended answer and counter-claims alleges three constitutional infirmities stemming from the MPPAA's statutory scheme for resolving disputes over the Fund's assessment of withdrawal liability. In order to evaluate these arguments, a brief overview of the MPPAA's relevant provisions is necessary. The MPPAA instructs the fund's trustees to determine the employer's proportionate share of unfunded vested liability and to collect the amount due. 29 U.S.C. § 1382. The Act provides several methods of computing withdrawal liability,[41] and also permits the trustees to design their own calculation method, subject to the approval of the PBGC. 29 U.S.C. §§ 1391, 1391(c)(5)(A). If the employer disputes the fund's determination, it may seek review with the plan sponsor regarding the determination of liability or the amount allegedly due. 29 U.S.C. § 1399(b)(2)(A). Any disputes unresolved by this informal review procedure must be submitted to arbitration. 29 U.S.C. § 1401(a)(1).

Section 1401, which details the arbitration procedure, provides that "any [withdrawal liability] determination made by a plan sponsor ... is presumed correct unless the party contesting the determination shows by a preponderance of the evidence that the determination was unreasonable or

clearly erroneous." 29 U.S.C. § 1401(a)(3)(A). The trustees' calculation of the fund's unfunded vested benefits is also presumed correct unless the complaining employer demonstrates by a preponderance of the evidence that the underlying actuarial assumptions were, in the aggregate, unreasonable, or that the plan's actuary "made a significant error in applying the actuarial assumptions or methods." 29 U.S.C. § 1401(a)(3)(B)(i)(ii). The arbitrator's decision is subject to review in the courts, 29 U.S.C. § 1401(b)(2); however, his findings of fact are presumed correct unless rebutted by a clear preponderance of the evidence. 29 U.S.C. § 1401(c).

Pepsi challenges this procedure on the grounds that it violates its fifth amendment due process rights, its seventh amendment right to a jury trial, and its right to a trial by an Article III count.

### Due Process

 Pepsi bases its fifth amendment claim on the allegation that the MPPAA's arbitration procedure is unconstitutionally skewed in favor of the trustees' determinations of withdrawal liability. It argues that given their fiduciary duty to the plan, the trustees cannot be impartial decision makers on issues relating to withdrawal liability. According to Pepsi, the unfairness stemming from this "institutional bias" is exacerbated by the presumption

---

challenge. The court will not allow the "vagueness" in Pepsi's allegations to prevent a judicial resolution of its vagueness claim with respect to the MPPAA. The court reiterates its conclusion that there is no constitutional infirmity inherent in Section 1393 of the MPPAA. Accordingly, Pepsi's seventeenth affirmative defense and twelfth counterclaim must be dismissed.

**41.** A more detailed explanation of the Plan's calculation of withdrawal liability is provided in *Washington Star Co. v. International Typographers Union Negotiated Pension Plan,* 729 F.2d 1502, 1505 (D.C.1984):

The MPPAA describes a variety of methods by which a plan may calculate the amount owed by a withdrawing employer. *See* 29 U.S.C. § 1391 (Supp. V 1981). *See generally* Cummings & Kershaw, *Withdrawal Liability Under the Multiemployer Pension Plan Amendments Act of 1980,* 40 N.Y.U. INST. ON FED. TAX'N § 12.–02[6] (ERISA Supp.1982). All methods

involve allocating the plan's unfunded vested benefits ("UVB") among contributing employers. The UVB is the actuarial present value of all nonforfeitable benefits under the plan minus the value of the plan's assets. The Act requires that plans, in calculating the UVB, use actuarial assumptions and methods that "in the aggregate, are reasonable" and that "in combinaton, offer the actuary's best estimate of anticipated experience under the plan." 29 U.S.C. § 1393(a)(1) (Supp. V 1981). Under the allocation method used by the plan in the present case, a withdrawing employer's liability is derived basically by multiplying the plan's UVB by a fraction. The numerator of this fraction is the sum of all contributions required to have been made by the withdrawing employer during the previous five years. The denominator is the sum of all contributions made by all the contributing employers during this same period.

accorded the trustees' determination in the arbitration procedure, and on review in the courts.

The Seventh Circuit has never addressed this aspect of the MPPAA's statutory scheme. Five circuits have upheld the constitutionality of these trustee statutory presumptions. *See, e.g., Keith Fulton & Sons, Inc. v. New England Teamsters and Trucking Industry Pension Fund, Inc.,* 762 F.2d 1137 (1st Cir.1985); *Textile Workers Pension Fund v. Standard Dye & Finishing Co.,* 725 F.2d 843, 854–55 (2d Cir.), *cert. denied,* 467 U.S. 1259, 104 S.Ct. 3554, 82 L.Ed.2d 856 (1984); *Washington Star Co. v. Int'l Typographical Union Negotiated Pension Plan,* 729 F.2d 1502, 1511 (D.C.Cir.1984); *Board of Trustees of the Western Conference of Teamsters Pension Trust Fund v. Thompson Building Materials, Inc.,* 749 F.2d 1396, 1403–04 (9th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 2116, 85 L.Ed.2d 481 (1985); *Republic Industries, Inc. v. Teamsters Joint Council No. 83,* 718 F.2d 628, 639–42 (4th Cir.1983), *cert. denied,* 467 U.S. 1259, 104 S.Ct. 3553, 82 L.Ed.2d 855 (1984). The Third Circuit recently reached an opposite conclusion, finding that the trustee's statutory presumptions in arbitration, coupled with the inherent bias of the plan Trustees, deprives an employer of his fifth amendment right to a fair and impartial tribunal. *United Retail & Wholesale Employees v. Yahn & McDonnell, Inc.,* 787 F.2d 128 (3d Cir. 1986). In the absence of a decision by the Seventh Circuit on this issue, this court finds that the Third Circuit's opinion in *Yahn & McDonnell* persuasively establishes the constitutional infirmity inherent in the MPPAA's arbitration procedures.

In *Marshall v. Jerrico, Inc.,* 446 U.S. 238, 242, 100 S.Ct. 1610, 1613, 64 L.Ed.2d 182 (1980), the Supreme Court explained the nature and purpose of the due process guarantee of an impartial decisionmaker:

> The Due Process clause entitles a person to an impartial and disinterested tribunal in both civil and criminal cases. This requirement of neutrality in adjudicative proceedings safeguards the two central concerns of procedural due process—the prevention of unjustified or mistaken deprivations and the promotion of participation and dialogue by affected individuals in the decisionmaking process. The neutrality requirement helps to guarantee that life, liberty or property will not be taken on the basis of an erroneous or distorted conception of the facts or the law.... At the same time, it preserves both the appearance and reality of fairness, 'generating the feeling, so important to a popular government, that justice has been done.' ... by *ensuring that no person will be deprived of his interests in the absence of a proceeding in which he may present his case with assurance that the arbiter is not predisposed to find against him.*

(citations omitted) (emphasis supplied). The requirement of neutrality has been "jealously guarded" by the Supreme Court. *Marshall,* 446 U.S. at 242, 100 S.Ct. at 1613. *See Schweiker v. McClure,* 456 U.S. 188, 195, 102 S.Ct. 1665, 1669, 72 L.Ed.2d 1 (1982); *Gibson v. Berryhill,* 411 U.S. 564, 579, 93 S.Ct. 1689, 1698, 36 L.Ed.2d 488 (1973); *Ward v. Village of Monroeville,* 409 U.S. 57, 61–62, 93 S.Ct. 80, 83–84, 34 L.Ed.2d 267 (1972); *Tumey v. Ohio,* 273 U.S. 510 47 S.Ct. 437, 71 L.Ed. 749 (1927).

In *Yahn & McDonnell,* the Third Circuit advanced a two-pronged argument against the constitutionality of the MPPAA's presumptions in arbitration.[42] First, it con-

---

**42.** The court held that the three-part balancing test set forth in *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976), was inapplicable to cases alleging the existence of a biased tribunal. 787 F.2d at 137. The court reasoned that the *Mathews* test, which requires a court to balance "the risk of an erroneous deprivation, the weight of the individual's interest, and the burden on the state of imposing additional safeguards," applies only in cases "involv-

ing claims of insufficient procedural safeguards, not allegations of a biased decisionmaker." At 137–38. The court explained:

> if the only problem with biased decisionmakers was the likelihood of error, it would make sense to apply the *Mathews* balancing test in cases involving allegations of biased decisionmakers and to subsume the problem of bias under the 'risk of erroneous deprivation'

sidered whether there was a sufficient demonstration of trustee bias. The court noted that, "[t]here is powerful evidence that the trustees have a significant conflict of interest: as fiduciaries of the plan, trustees have a natural inclination and may even consider it a duty to maximize the fund by extracting as much money as possible from withdrawing employers." At 138. The court also recognized the natural bias against a withdrawing employer. It rejected the argument that the employer-appointed trustees would retain an allegiance to management and therefore counterbalance any bias exhibited by the labor-appointed trustees. Because all trustees are fiduciaries of the fund, they owe an exclusive and paramount duty of loyalty to the fund. 29 U.S.C. § 1104. In fact, the Supreme Court has rejected the contention that a trustee may retain an allegiance to the party that appointed him. *See NLRB v. Amax Coal*, 453 U.S. 322, 330, 101 S.Ct. 2789, 2794, 69 L.Ed.2d 672 (1981).

The court admitted that despite this exclusive loyalty to the fund, the trustees' interest in encouraging participation in the fund may temper the temptation to unfairly maximize withdrawal liability assessments. It concluded, however, that

> this possibility does not mean the trustees are less biased, only that their manifest bias will not always result in gross injustice to employers... 'It seems an odd principle to determine the possibility of manifest bias by weighing the decisionmaker's conflicting interest in the scales of justice and deciding which side predominates,' (*citing Keith Fulton & Sons, Inc. v. New England Teamsters and Trucking Industry Pension Fund, Inc.*, 762 F.2d 1137, 1149–50 (1st Cir. 1985) (Aldrich, J., dissenting)). The due process right to an unbiased decisionmaker is not satisfied by speculation that countervailing concerns may restrain

prong of the three-part test. However, the requirement of an impartial decisionmaker transcends concern for diminishing the likelihood of error. The unfairness that results from impartial decisionmakers strikes so

clearly biased parties from excessively harsh judgments.

*Yahn & McDonnell*, 787 F.2d at 139 (footnote omitted).

This court agrees with the Third Circuit's assessment of the trustees' inherent bias which emphasizes the continued financial solvency of a pension fund. As keepers of the trust, they have a paramount duty of insuring the preservation of the trust corpus which overrides any prior relationship they may have had to the trust contributors. *See NLRB v. Amax*, 453 U.S. 332, 101 S.Ct. 2789, 69 L.Ed.2d 672 (1981).

After concluding that the trustees are "decisionmakers with a manifest and significant bias," the Third Circuit then considered whether this bias is ameliorated by controls on the trustees' discretionary decisionmaking or by the mechanics of the arbitration process. *Yahn & McDonnell*, at 140. It noted that the First Circuit's decision in favor of the constitutionality of the statutory presumptions was premised on its conclusion that the trustees' calculation of withdrawal liability was largely ministerial in nature. *Keith Fulton*, 762 F.2d at 1141. This determination was also a critical factor in the Fourth and Ninth Circuit decisions upholding the constitutionality of Section 1401's statutory presumptions. *See Republic Industries, Inc. v. Teamsters Joint Council No. 83*, 718 F.2d 628, 640 n. 13 (4th Cir.1983), *cert. denied*, 467 U.S. 1259, 104 S.Ct. 3554, 82 L.Ed.2d 856 (1984); *Board of Trustees of the Western Conference of Teamsters Pension Trust Fund v. Thompson Building Materials, Inc.*, 749 F.2d 1396, 1403–04 (9th Cir.1984), *cert. denied*, — U.S. —, 105 S.Ct. 2116, 85 L.Ed.2d 481 (1985).

The Third Circuit conceded that, if the trustees had no discretion, their bias would not render the statutory procedure constitutionally infirm, because the bias could not affect the ultimate determination of

deeply at our sense of justice that it differs qualitatively from the injury that results from insufficient procedures.

787 F.2d at 137–38.

withdrawal liability. *Yahn & McDonnell,* at 140. It found, however, that contrary to the assertions of the other circuits, the trustees possess significant discretion in the determination and calculation of withdrawal liability. *Id.* The court concluded:

> While the trustees must apply their chosen actuarial method uniformly among withdrawn employers, the statute leaves them free to pick among the four suggested methods or to choose their own. Moreover, ... determinations of appropriate discount rates, a matter that varies in each case, may involve large amounts of money. In *Keith Fulton,* the trustees had selected a discount rate of 7.5% although expert testimony suggested that a rate of 14.5% would have been reasonable. The difference between the two accounted for a gap of a considerable amount. Additionally, assessments under §§ 1382–1399 require trustees to determine whether an employer falls under one of several statutory exemptions. This decision involves complex determinations such as whether a sale of assets is a bona fide arm's length deal. 29 U.S.C. § 1384 (1982). Not only are these matters in which the exercise of significant discretion is unavoidable, but the trustees' determination can be the difference between a finding of *no* liability and a finding of liability in a large amount. The need to make such determinations belies the notion that the trustees perform a largely ministerial function. Indeed, the legislative history of MPPAA reveals that Congress expected the trustees to exercise wide discretion. Congress realized that '[p]lan fiduciaries are given a great deal of flexibility to strike a balance among the competing considerations of encouraging new entrants, discouraging withdrawals, easing administrative burdens, and protecting the financial soundness of a fund.' H.R. Rep. No. 869, 96th Cong., 2d Sess. 67, *reprinted in* 1980 U.S. Code Cong. & Ad.News 2935.

> We conclude that the due process problem occasioned by the trustees' bias is not eliminated or even much attenuated by the fact that the trustees lack discretion to apply different actuarial methods to different withdrawing employers.

*Yahn & McDonnell,* 787 F.2d at 140–41 (footnotes omitted).

This court concurs with the Third Circuit's assessment of the discretionary role of plan trustees in the determination of withdrawal liability. Indeed, the Seventh Circuit recognized this discretion in *Peick v. PBGC,* 724 F.2d 1247, 1256 (7th Cir. 1983), *cert. denied,* 467 U.S. 1259, 104 S.Ct. 3554, 82 L.Ed.2d 855 (1984):

> The trustees have substantial discretion in deciding how much to assess any given employer or employers.... [T]he statute lists several different methods of allocating a plan's unfunded vested liability, and it further empowers the trustees to seek PBGC approval of a completely different method of their own design.

Furthermore, as the *Yahn & McDonnell* court noted, this discretion extends far beyond the mere numerical calculation of a liability assessment. The underlying assumptions which comprise each step of the calculation process involve matters which are determined, at the first instance, by the trustees of the Fund. For instance, a Fund's determination with respect to whether certain exemptions will apply can dramatically affect the calculation of withdrawal liability.[43] *See* Note, *Trading Fairness for Efficiency: Constitutionality of the Dispute Resolution Procedures of the Multiemployer Pension Plan Amendments Act of 1980,* 71 Geo.L.J. 161, 166 (1982) (hereinafter "Georgetown Note"). Similarly, the MPPAA directs the Plan to use actuarial assumptions that "in the aggregate, are reasonable" and "in combination, offer the actuary's best estimate of anticipated experience under the plan." 29

---

**43.** This is a critical determination in the present case, because the Fund's conclusions regarding Pepsi's treatment of LeeWay significantly affect-ed its determination and calculation of the controlled group's withdrawal liability assessment.

U.S.C. § 1393(a)(1). However, as one commentator has noted,

> [S]etting actuarial assumptions is as much an art as a science, involving the application of past experience to the future. Forecasts of future wage and interest rates are particularly uncertain in the current period of economic stress. Because such assumptions are necessarily imprecise, assumptions that are 'reasonable in the aggregate' cover a range. Yet, even small differences in certain assumptions can affect dramatically the actuary's calculations.... [I]n one case a decrease of three and a quarter percentage points in the interest rate assumptions ... resulted in an increase of twenty-six percent in the employer's withdrawal liability.[44]

*Georgetown Note, supra,* at 167–68 (footnotes omitted). This court concludes that in light of the significant role the trustees play in determining the applicability of statutory exemptions and the propriety of certain actuarial assumptions, the significance of their discretion cannot be lightly dismissed. The MPPAA accords them substantial decisionmaking authority in the determination and calculation of a withdrawal liability assessment.[45]

The Third Circuit next considered whether the availability of arbitration ensures the minimum guarantees of due process to withdrawing employers. The court unequivocally held that

> where an initial hearing is tainted by bias, arbitration cannot provide the requisite fair hearing if the arbitration proceeding is not *de novo.* Neither the appearance nor reality of fairness is served when a tainted verdict is presumed correct in subsequent review.... Regardless of the importance of ensuring the

solvency of pension plans, and the reasonable relation between that end and the statutory scheme, one requirement can be clearly deduced from basic principles of judicial fairness and from Supreme Court jurisprudence: the assessment of liability must be made by an unbiased party.

787 F.2d at 141–42.

This court agrees. The arbitration process outlined in Section 1401 does nothing to ameliorate the bias and discretionary decisionmaking authority that the MPPAA confers on plan trustees. The creation of presumptions only exacerbates the problem because it insulates these determinations from effective review. The Supreme Court has emphasized that a "petitioner is entitled to a neutral and detached judge in the first instance." *Ward v. Village of Monroeville,* 409 U.S. 57, 61–62, 93 S.Ct. 80, 84, 34 L.Ed.2d 267 (1972). The MPPAA's scheme not only denies employers of this right in the first instance, it effectively precludes them from *ever* receiving an impartial decisionmaker. As one commentator has noted:

> These statutory presumptions transform the arbitration from a de novo adjudication to a limited review of the pension plan's determinations. In operation, this scheme places the pension plan in the role of a jury, a trial judge, or an administrative agency, and the arbitrator in the role of an appellate judge. This unusual allocation of functions is suspect because the plan, an interested party, possesses none of the characteristics of juries, judges or agencies that justify deference to their findings.

*Georgetown Note, supra,* at 173 (footnotes

---

**44.** *See Penn Textile Corp. & Textile Workers Pension Fund,* 3 EBC 1609, 1617 (1982).

**45.** Furthermore, as the court noted in *Yahn & McDonnell,*
> We must also reject the suggestion, advanced tangentially by the majority in *Keith Fulton,* that the trustees' role is not adjudicative in nature. The trustees perform the judicial task of making case-by-case determinations significantly affecting the property of employers.

In holding in [*Marshall v.*] *Jerrico, supra,* that the Assistant Regional Administrator's function was prosecutorial rather than judicial, the Court noted that 'he rules on no disputed factual or legal questions.' 446 U.S. at 247 [100 S.Ct. at 1615]. As noted, the trustees must frequently make complex legal and factual determinations.
787 F.2d at 141 n. 18.

omitted).[46] The provision for judicial review only adds another layer of reinforcement to the Fund; it does nothing to insure an employer an impartial tribunal. The limited scope of judicial review effectively precludes a court from overruling the arbitrator, who, in the majority of cases, is rendered powerless to change the original determinations of the Fund. The net effect is a judicial rubber stamp of significant financial decisions made by an inherently biased party. This result cannot be reconciled with the requirements of due process.[47]

■■■ The court's conclusion regarding the constitutionality of this arbitration process raises another important issue: the effect of this decision on the constitutionality of the MPPAA as a whole. On this issue, we are guided by the precept that a court should refrain from invalidating any more of the statute than is necessary under the circumstances. *Regan v. Time, Inc.,* 468 U.S. 641, 104 S.Ct. 3262, 3269, 82 L.Ed.2d 487 (1984); *Yahn & McDonnell,* at 141. In *Yahn & McDonnell,* the court highlighted the three aspects of the MPPAA which, taken together, deprive an employer of an impartial decisionmaker: "the initial determination of liability by biased trustees; the deference the arbitrator must grant to the trustees determination; and the deference the district court must grant to the arbitrator's determination." At 142. The court emphasized that "[i]f severing only one of these provisions from the scheme will save the constitutionality of the MPPAA, we are obliged by princi-

ples of statutory construction and the separation-of-powers concerns that underlie them to strike down only that provision." *Id.* (citation omitted). The court determined that Section 1401(a)(3)(A), which authorizes the presumptions in arbitration, was the best candidate for severance because it was the least central to the intent of the Congressional scheme, and its severance would not upset the constitutionality of the remainder of the MPPAA. 787 F.2d at 142–43.[48]

This court agrees with the Third Circuit's assessment of the proper candidate for severance. One aspect of the opinion is curious, however. Throughout the opinion, the court emphasizes the inherent bias of the trustees and the constitutional infirmity presented by the presumption of correction in arbitration. The discussion of these presumptions would appear to apply to the presumptions contained in both § 1401(a)(3)(A) and (B); however, the court apparently only invalidated the presumption outlined in Section 1401(a)(3)(A). In this court's view, both provisions render the trustees' assessment of liability constitutionally infirm. Accordingly, this court finds that, consistent with due process, the arbitrators cannot accord *any* presumption of correctness to the withdrawal liability assessments determined and calculated by the trustees of a pension fund. This is the result reached by the original panel in *Keith Fulton,* 762 F.2d 1124, 1134–35 (1st Cir.1984), *rev'd en banc,* 762 F.2d 1137 (1st Cir.1985), and Judge Aldrich's well rea-

**46.** This note also emphasizes the difficulty of establishing that a decision is "unreasonable" or "clearly erroneous" under prevailing legal standards. *See Georgetown Note* at 174–79.

**47.** In his dissent from the majority opinion in *Keith Fulton,* Judge Aldrich aptly characterized the manner in which the MPPAA "stacks the deck" against the withdrawing employer:
> To put plaintiff's claim baldly, he finds himself, without possibility of relief, in a boxing ring from which he had been told he might be exempt, the prize being his own money, in an uneven match, but assured by the referee that he would see to it that it was a fair fight. Although not put in exactly those terms, the

justification offered for this is that it was his own fault for associating with people like that, and his opponent needs the money. *Keith Fulton,* 762 F.2d 1137, 1146 (1st Cir.1985) (Aldrich, J., dissenting).

**48.** The court reasoned that the other two suspect provisions were integral to Congress' intent in enacting the statute. The court emphasized the fact that leaving the determination of liability to the trustees fulfilled "Congress' effort to capitalize on the expertise of persons experienced in and devoted to the pension fund process," and instructing the courts to "defer to the arbitrator's factual findings is commonplace in the context of judicial review." 787 F.2d at 142.

soned dissent from the en banc reversal. 762 F.2d at 1151.

There is no question that the MPPAA survives the severance of § 1401(a)(3). The statutory scheme remains intact, with the exception that when an employer requests arbitration, he will receive an unfettered arbitrator who will be free to decide the dispute on the merits. After the arbitrator reaches his decision, those conclusions will be accorded a presumption of correctness in the event that they are appealed to the district court.

### Right To Jury Trial

Pepsi's seventh amendment claim is predicated on its asserted "right" to a jury trial in this case.[49] In *Peick v. PBGC,* 724 F.2d 1247, 1277 (7th Cir.1983), *cert. denied,* 467 U.S. 1259, 104 S.Ct. 3554, 82 L.Ed.2d 855 (1984), the Seventh Circuit summarily disposed of this argument:

> We also reject appellants' seventh amendment-based claim. The Supreme Court's recent opinion in *Atlas Roofing Co. v. Occupational Safety and Health Review Commission,* 430 U.S. 442, 97 S.Ct. 1261, 51 L.Ed.2d 464 (1977), clearly sanctions the use of mandatory arbitration under a statute like the MPPAA. The Court expressly found that Congress may assign to a nonjudicial forum the authority to initially adjudicate claims derived from 'statutory public rights' which it has created. Despite appellants' contention to the contrary, we agree with the district court that the MPPAA does indeed create 'statutory public rights.' Liability under the MPPAA is not a contractually or privately created burden, rather it is imposed by law and its bene-

fits eventually inure to all beneficiaries of multiemployer pension plans. We therefore conclude that Congress did not abridge the appellants' rights to a jury trial under the seventh amendment by requiring appellants to arbitrate their dispute before seeking a judicial remedy. *Peick,* 724 F.2d at 1277.[50]

■ This affirmative defense and counterclaim also alleges that the mandatory arbitration procedures deny Pepsi the right to a trial by an Article III court. Pepsi has not explained this contention in any of its numerous pleadings filed in this case. Although the *Peick* decision did not discuss this claim, the court finds that in light of the review process contemplated in 29 U.S.C. § 1401(b)(2), this claim is without merit. *See Board of Trustees of the Western Conference of Teamsters Pension Trust v. Thompson Building Materials, Inc.,* 749 F.2d 1396, 1404–05 (9th Cir.1984), *cert. denied,* — U.S. —, 105 S.Ct. 2116, 85 L.Ed.2d 481 (1985); *Republic Industries, Inc. v. Teamsters Joint Council,* 718 F.2d 628, 640 (4th Cir.1983), *cert. denied,* 467 U.S. 1259, 104 S.Ct. 3554, 82 L.Ed.2d 856 (1984).

### Interim Payments

■ Pepsi also challenges the constitutionality of the MPPAA's requirement of interim payments pending a final determination by the arbitrator.[51] The MPPAA contemplates a "pay now, dispute later" procedure. 29 U.S.C. § 1401(d) provides: "Payments shall be made by an employer in accordance with the determinations made under this part until the arbitrator issues a final decision with respect to the

---

**49.** The seventh amendment provides that:

In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any court of the United States, than according to the rules of the common law.

**50.** The court also rejected the employer's "right of access" claim:

There is clearly no abridgment of appellants' right of 'access to the courts' since the statute

itself expressly provides for judicial review of any arbitration award. 29 U.S.C. § 1401(b)(2) (Supp. V 1981).... Under the MPPAA, arbitration is used as a means of encouraging parties to attempt to reach settlement with respect to obligations created by the Act itself. Arbitration is thus merely the first step in resolving conflicts arising from the Act.

*Peick,* 724 F.2d at 1277.

**51.** The court notes at the outset that Pepsi has made no payments to date.

determination submitted for arbitration, with any necessary adjustments in subsequent payments for overpayments or underpayments arising out of the decision of the arbitrator with respect to the determination...." [52]

In *Dorns Transportation, Inc. v. IAM National Pension Fund*, 578 F.Supp. 1222, 1232 (D.D.C.1984), *aff'd*, 753 F.2d 166 (D.C. Cir.1985), the court explained the underlying purpose of these pre-hearing payment provisions:

The legislative history voices Congressional concern with the adverse effects of non-payment of liability upon multiemployer plans. Plans lose the benefit of investment income that may have been earned upon timely payments. Additional administrative costs are incurred by the need to ascertain, review and defend challenges to the amount of imposed liability. By requiring payments during the adjudicatory process, Congress sought to further the policy that those who remain in the fund should not bear additional burdens and losses from employer withdrawals. ... By requiring payment pending appeal, the Act effectuates the avowed purpose of shifting the economic burdens of withdrawal back to the withdrawing employer.

(citations omitted). Pepsi's due process claim surrounding these provisions basically asserts that Congress cannot require a business to pay a withdrawal assessment up front, prior to the resolution of its defenses to liability. This argument contains one fatal flaw: it overstates the requirements of due process in the present circumstances. Due process requires that a party be given the opportunity to be heard at a meaningful time and in a meaningful manner. *Textile Workers Pension Fund v. Standard Dye & Finishing Co.*, 725 F.2d 843, 854 (2d Cir.), *cert. denied*, 467 U.S. 1259, 104 S.Ct. 3554, 82 L.Ed.2d 856 (1984). The requirements of due process are flexible, however, and do not necessarily require that a hearing must precede all government actions affecting a party's interests. In *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976), the Supreme Court emphasized three factors a court should consider when determining whether a pre-seizure hearing is necessary: the government's interest in utilizing the challenged procedures, the risk of error inherent in these procedures, and the private interests affected by the challenged procedures. In *Textile Workers Pension Fund, supra*, the court cogently explained why these considerations fail to demonstrate the need for a hearing prior to an order of interim payments under the MPPAA. It held:

[T]he only private interest affected here is the employer's bank account. Since the statute requires an employer to make payments to the fund for its withdrawal liability, the MPPAA deprives it of the use of the funds paid. 29 U.S.C. § 1399(c). Nonetheless, such deprivation may be only temporary for if it is later found that an employer did not owe the amount determined, or that it owed a lesser amount, the employer is entitled to a refund or an adjustment in the amount of its liability. *Id.* §§ 1103(c)(4), 1401(d). Again, while a full hearing prior to payment of withdrawal liability might reduce the possibility of an erroneous assessment, under the statute an employer is already permitted to furnish the plan with further information or point out inaccuracies in the Fund's determination of liability. *Id.* § 1399(b)(2). In such case, the Fund is required to undertake a "reasonable review" of such information, *id.* § 1399(b)(2)(B), and must notify the employer of its decision, the grounds for its decision, and the reason for any modification in the employer's withdrawal liability, *id.* These statutory provisions afford the Fund and the employer an opportunity to iron out their differences, possibly

---

**52.** *See also* 29 U.S.C. 1399(c)(2), which provides: "Withdrawal liability shall be payable in accordance with the schedule set forth by the plan sponsor under subsection (b)(1) of this section beginning no later than 60 days after the date of the demand notwithstanding any request for review or appeal of determinations of the amount of such liability or of the schedule."

eliminating an erroneous deprivation of an employer's property. Upon a consideration of the public interests here involved, ... we have concluded that the legislative scheme employed by Congress for the collection of employer withdrawal liability was rational and [does] not violate [defendant's] right to due process of law.

725 F.2d 843, 854 (citations omitted). This conclusion is in accord with the other circuits who have considered this issue. *See, e.g., Board of Trustees of the Western Conference of the Teamsters Pension Trust Fund v. Thompson Building Materials, Inc.,* 749 F.2d 1396, 1404 (9th Cir. 1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 2116, 85 L.Ed.2d 481 (1985); *Keith Fulton & Sons, Inc. v. New England Teamsters and Trucking Industry Pension Fund, Inc.,* 762 F.2d 1124, 1135–36 (1st Cir.1984), *modified on other grounds,* 762 F.2d 1137 (1st Cir.1985); *Republic Industries, Inc. v. Teamsters Joint Council No. 83 of Virginia Pension Fund,* 718 F.2d 628, 639–42 (4th Cir.1983), *cert. denied,* 467 U.S. 1259, 104 S.Ct. 3553, 82 L.Ed.2d 855 (1984); *Dorns Transportation, Inc. v. IAM National Pension Fund,* 578 F.Supp. 1222, 1232 (D.D.C.1984), *aff'd,* 753 F.2d 166 (D.C. Cir.1985).

### Conclusion

In accordance with the foregoing opinion, the court grants the Fund's motion to dismiss Pepsi's constitutional counterclaims in part and denies it in part. Pepsi's motion for partial summary judgment is granted to the extent that this court has ordered the Fund to recompute the Pepsi group's withdrawal liability in a manner consistent with this opinion.

The court finds that the Trustees must recompute the withdrawal liability assessments for the Pepsi group's alleged withdrawals in 1981, 1982, 1983 and 1984. The

foregoing opinion decides all of Pepsi's statutory and constitutional arguments against imposition of controlled group liability and the operation of the withdrawal liability provisions of the MPPAA. Accordingly, if Pepsi disputes the Fund's amended withdrawal liability determinations, it must resort to the statutory methods provided in the MPPAA for the resolution of employer disputes.[53] Therefore, Pepsi may seek review from the Fund under 29 U.S.C. § 1399(b)(2)(A); and it may initiate arbitration within sixty days of its receipt of the Fund's assessment under 29 U.S.C. § 1401. Although the Fund will not be entitled to any presumption of correctness in arbitration, it will be entitled to collect interim payments pending the resolution of any dispute pursuant to 29 U.S.C. § 1399 or 1401.

On Motions to Compel Interim Payments

Plaintiff has filed motions to compel defendants to make interim payments of withdrawal liability pending final disposition of this litigation. On May 8, 1986, this court issued a memorandum opinion in these consolidated cases addressing the imposition of controlled group liability by the Central States, Southeast and Southwest Areas Pension Fund ("Central States" or "the Fund") on defendant Pepsico, Inc. ("Pepsico") and several of its wholly owned subsidiaries ("Pepsi controlled group" or "Pepsi"). The court held, *inter alia,* that the Fund correctly interpreted Section 1301(b)(1) of ERISA, 29 U.S.C. § 1301(b)(1), to apply to all withdrawal liability calculations under Title IV of ERISA, as amended by the MPPAA. However, the court instructed the Fund to re-compute the defendant's withdrawal liability, taking into account certain statutory exemptions within Title IV of the MPPAA. This opinion implements that prior opinion, and the present opinion rules on the Fund's pending motions to compel interim payments in

---

**53.** Pepsi has not waived its right to invoke arbitration in this case. All of the issues resolved in this opinion are constitutional and statutory issues beyond the purview of the arbitrator's authority and expertise. *Republic Industries, Inc. v. Teamsters Joint Council No. 83,* 718 F.2d 628,

644 (4th Cir.1983), *cert. denied,* 467 U.S. 1259, 104 S.Ct. 3553, 82 L.Ed.2d 855 (1984); *Centennial States Carpenters Pension Trust Fund v. Woodworkers of Denver, Inc.,* 615 F.Supp. 1063, 1068 (D.Col.1985).

both the *Robbins* and *Central States* lawsuits.[1]

## Interim Payment Provisions of the MPPAA

As this court noted in its May 8, 1986 order, the MPPAA contemplates a "pay now, dispute later" collection procedure for withdrawal liability assessments. Mem.Op. at 677–679. Specifically, 29 U.S.C. § 1399(c) provides:

> (2) Withdrawal liability shall be payable in accordance with the schedule set forth by the plan sponsor under subsection (b)(1) of this section beginning no later than 60 days after the date of the demand notwithstanding any request for review or appeal of determinations of the amount of such liability or of the schedule.
>
> (3) Each annual payment determined under paragraph (1)(C) shall be payable in 4 equal installments due quarterly, or at other intervals specified by plan rules. If a payment is not made when due, interest on the payment shall accrue from the due date until the date on which the payment is made.[2]

In a similar vein, 29 U.S.C. § 1401(d) provides:

> Payments shall be made by an employer in accordance with the determinations made under this part until the arbitrator issues a final decision with respect to the determination submitted for arbitration, with any necessary adjustments in subsequent payments for overpayments or underpayments arising out of the decision of the arbitrator with respect to the determination.

These two provisions reflect Congress' intent to disallow a suspension in contributions to the fund pending the resolution of an employer's dispute over the determination and calculation of withdrawal liability.

*See Connors v. B.D.S. Coal Co., Inc.*, No. 84–0475, slip op. at 3 (D.D.C. August 21, 1985) ("[S]trong Congressional policy of assuring uninterrupted funding of multiemployer pension plans mandates that this court enforce this requirement *pendente lite*"); *Trustees of the Retirement Fund of the Fur Manufacturing Industry v. Lazar-Wisotzky, Inc.*, 550 F.Supp. 35, 38 (S.D.N.Y.1982), *aff'd* 738 F.2d 419 (2d Cir. 1984) (noting "the extremely strong interest in keeping fund payments current which permeates the statutory scheme"). The legislative history of the MPPAA further reinforces Congress' intent to disallow a withdrawing employer from using a withdrawal liability dispute to suspend or delay payment of his assessment. *See Thomas v. Southland Corp.*, 603 F.Supp. 1088, 1089 n. 1 (N.D.Ill.1985) (*citing* Senate Labor and Human Resources Committee and Finance Committee, Joint Explanation of S. 1076: Multiemployer Pension Plan Amendments Act of 1980, 126 Cong.Rec.S. 10120 (Daily Ed. July 29, 1980)).

■ "Under the MPPAA, an employer who withdraws must immediately begin to pay a fixed and certain debt owed to the plan." *Peick v. PBGC*, 724 F.2d 1247, 1255 (7th Cir.1983), *cert. denied*, 467 U.S. 1259, 104 S.Ct. 3554, 82 L.Ed.2d 855 (1984). This court's May 8, 1986 opinion upheld the constitutionality of this interim payment provision, and noted that no withdrawal liability payments have been made on the Fund's outstanding withdrawal liability assessments. Mem.Op. at 677 and note 51. Having disposed of all the defendants' constitutional and statutory objections to the imposition of withdrawal liability, the court is now in a position to rule on the availability of interim payments. For the following reasons, the court finds that, pursuant to 29 U.S.C. § 1399(c)(2), the Pepsi group

---

1. The court's May 8, 1986 memorandum opinion outlines the procedural history of these cases and the relationship of the different parties in this litigation. *See* Mem.Op. at 684–685. This information will not be repeated except to the extent that it bears directly on the motions discussed in this opinion.

2. The statute also permits a multiemployer plan to adopt rules for the other terms and conditions for the satisfaction of an employer's withdrawal liability. *See* 29 U.S.C. § 1399(c)(7). The parties have not informed the court of any such conditions which pertain to the pending motions, and the court assumes there are none.

should commence paying the interim payments in the amount set forth in the Fund's original calculations, subject to a prompt amendment of the amount of the payments in accordance with the Fund's reassessment of the group's liability consistent with the court's earlier order.

Although the statute *mandates* that an employer make interim payments in accordance with the schedule provided by the Fund, Pepsi has never tendered any payments to the Fund for its alleged withdrawals in 1981, 1982, 1983 and 1984. The court finds that the Fund is entitled to these payments under the statute. These payments were not ordered earlier when initially requested by the Fund because it was necessary to rule on a number of motions filed by Pepsi asserting various constitutional and statutory claims contrary to the statutory requirement for withdrawal payments.[3] *See Baldwin v. Shopmen's Iron-workers Pension Trust*, 3 E.B.C. 1713 (C.D.Cal.1982); *Woodward Sand Co. v. Operating Engineers Pension Trust*, 2 E.B.C. 2161 (C.D.Cal.1981).[4] However, the Fund should not be prejudiced by the delay caused by these actions. Accordingly, under the facts of this case, the court finds that Pepsi must provide the interim payments for each assessment which are past due, plus interest,[5] and must continue these payments after the Fund's amended calculation pending final resolution of this litigation.

Interim payments must be made pursuant to 29 U.S.C. § 1399(c)(2) for several reasons. First, this is an ongoing responsibility that Congress has imposed on Pepsi as a withdrawing employer. Under the MPPAA, the duty to provide these payments commenced in 1983, when Pepsi received the first notice of withdrawal and accompanying assessment of liability.[6]

**3.** Although several claims for indemnity still remain subject to a pending motion to dismiss, the court need not resolve them in order to grant the Fund's motion to compel interim payments, because Congress intended these payments to commence notwithstanding the existence of an employer's defenses. The fact that Congress ordered payments *while disputes were pending* indicates that it did not intend to allow any defenses to interfere with the continuous flow of contributions to the Fund.

**4.** One circuit has held that an employer has a duty to make interim payments pending the resolution of his constitutional claims. *See Republic Industries, Inc. v. Central Pennsylvania Teamsters Pension Fund*, 693 F.2d 290, 298 (3d Cir.1982).

**5.** 29 U.S.C. § 1399(c)(3) provides that "If a payment is not made when due, interest on the payment shall accrue from the due date until the date on which the payment was made." The Trustee must calculate the interest in accordance with the regulations promulgated by the PBGC. *See* 29 C.F.R. § 2644.3 (1984).

**6.** The Pepsi group has raised a laches defense to the 1981 withdrawal liability assessment. *Robbins* Amended Answer and Affirmative Defense, ¶ 11. 29 U.S.C. § 1399(b)(1) provides:
As soon as practicable after an employer's complete or partial withdrawal, the plan sponsor shall
(A) notify the employer of—
(i) the amount of the liability, and
(ii) the schedule for liability payments, and
(B) demand payment in accordance with the schedule.
Pepsi's laches claim is predicated on the fact that although the alleged withdrawal occurred in 1981, the Fund did not notify Pepsi of its liability assessment until two years later, in 1983.
In order to establish a claim of laches, the defendant must show that the plaintiffs were guilty of unreasonable delay and the defendants were prejudiced thereby. *Combs v. Western Coal Co.*, 611 F.Supp. 917, 919 (D.D.C.1985). Under the facts of this case, the court need not determine whether the two year delay was so unreasonable as to warrant a dismissal of the case, because the defendants have not established any prejudice resulting from the delay. Pepsi's alleged partial withdrawal in 1981 occurred roughly one year after the MPPAA was enacted. Given the complicated nature of the Fund's claim against the entire group, some delay in implementing the new statute was to be expected. Furthermore, as the court noted in *Combs v. Western Coal Corp., supra,* at 920,
Congress has specifically established a six year statute of limitations for actions, such as this one, to collect withdrawal liability payments. 29 U.S.C. § 1451(f).... [P]laintiffs brought this suit well before the expiration of the limitations period. Thus, there is an applicable statute of limitations which has not yet expired, so defendant cannot rely on laches as a defense.
(Citations omitted.) Accordingly, the court rejects Pepsi's laches claim against the Fund stemming from the 1981 withdrawal liability assessment.

Any further delay in ordering interim payments would run counter to the clear mandate of Congress set forth in the MPPAA.

The court cannot determine what effect its May 8th order will have on the Fund's ultimate calculation of liability. The court ordered a reassessment of the earlier calculation because it was unclear whether the Fund considered the applicability of various exemptions set forth in the MPPAA. *See* 29 U.S.C. § 1392(c).[7] Under these circumstances, the court's order to pay the interim assessments contained in the original schedules is the most appropriate method of implementing Congress' intent regarding installment payments pending the resolution of any disputes over the determination or calculation of withdrawal liability.[8] If the Trustees' ultimate calculation indicates that the Pepsi group has been overassessed, there is a statutory mechanism to provide the appropriate restitution or adjustment. *See* 29 U.S.C. § 1401(d).[9]

## Pepsi's Defenses To An Order Compelling Interim Payments

■ Pepsi argues that the Fund has improperly calculated the 1982 and 1983 assessments in several respects. For instance, Pepsi argues that the Fund failed to account for withdrawal liability payments for preceding years, as required by 29 U.S.C. § 1386(b),[10] and the Fund improperly increased its unfunded vested liability through increasing benefit levels at a time when it was underfunded (*Central States* Mem. in Opp. to Motion to Compel Interim Payments at 13 n. 16, 16 n. 20). These claims are no defense to the interim payments requirement set forth in 29 U.S.C. § 1399(c)(2), however. They represent issues that Pepsi should raise in its review with the Fund or before the arbitrator. If they are decided in Pepsi's favor, then a

---

7. For purposes of this case, the court's May 8, 1986 opinion notified the Fund—and the arbitrator—that Section 1301(b)(1) applies to all withdrawal liability decisions under Title IV of the MPPAA. The same is true with respect to the statutory exemptions set forth in the statute. The opinion directed the Trustees to consider whether certain exemptions are applicable to the calculations at issue. The court did not require the Fund to apply these exemptions, however. The trustees may still determine they are inapplicable under 29 U.S.C. § 1392(c) or for another reason fail to satisfy the specific statutory criteria of the exemption at issue. *See New York State Teamsters Conference Pension & Retirement Fund v. St. Lawrence Transit Mix Corporation,* 612 F.Supp. 1003, 1009 (N.D.N.Y. 1985) (MPPAA's statutory exemptions should be narrowly construed).

8. This is the result that would be obtained if an arbitrator ordered a reduction with respect to the Fund's calculation of a liability assessment. Section 1401(d) provides that the payments shall be made pending the final decision of an arbitrator, "with any necessary adjustments in subsequent payments for overpayments or underpayments." *Meatcutters Union Local No. 88 v. Del Monte Supermarkets,* 565 F.Supp. 27 (E.D. Mo.), *vac. on joint motion,* 4 E.B.C. 2168 (8th Cir.1983), cited by defendants, does not alter the court's conclusion that interim payments must commence immediately. In that case, the court concluded that the determination of liability and schedule of payments were invalid as a matter of law, and allowed the trustees to make another determination "if they sought fit to do

so in the future." Under those circumstances, the court found "it would be manifestly unfair" to require defendants to pay in accordance with these schedules. *Id.* at 30. Unlike the situation in *Meatcutters,* this court has reached no conclusion regarding the propriety of the Trustees' assertion of withdrawal liability over these defendants. Therefore, this holding is inapplicable to the case presently before the court.

9. Pepsi argues that § 1401(d) only provides for reductions in *subsequent* payments, and therefore does not authorize a total reimbursement in the event that the arbitrator—or the court—determines that *no* withdrawal has occurred, and Pepsi has no liability to the Fund. Although this statute does indicate that the reimbursement comes from subsequent payments, the court finds that this section would not *prevent* a court-ordered full reimbursement if the facts warranted one. *See Combs v. Manor Mines, Inc.,* 5 E.B.C. 1475, 1478 (D.D.C. March 16, 1984); *Terson Co., Inc. v. PBGC,* 565 F.Supp. 203, 208 (N.D.Ill.1982).

10. 29 U.S.C. § 1386(b)(1) provides:

In the case of an employer that has withdrawal liability for a partial withdrawal from a plan, any withdrawal liability of that employer for a partial or complete withdrawal from that plan in a subsequent plan year shall be reduced by the amount of any partial withdrawal liability (reduced by any abatement or reduction of such liability) of the employer with respect to the plan for a previous year. 29 U.S.C. § 1386(b)(1).

reduction or reimbursement will be in order. Regardless of the merits of these claims, they do not justify the suspension of the statutorily mandated interim withdrawal liability payments. As the court stated in *Trustees of the Retirement Fund of the Fur Manufacturers Industry v. Lazar-Wisotzky, Inc.*, 550 F.Supp. 35, 37–38 (S.D.N.Y.1982), *aff'd*, 738 F.2d 419 (2d Cir. 1984),

> Allegations of disparity or other improprieties in the contractual basis for contributions to the Fund do not absolve an employer of its statutory duties under the Act, but rather, may afford it a cause of action against the Trustees. The issue of whether the alleged misconduct affects the proper computation of an employer's withdrawal liability is one properly subject to resolution by an arbitrator, pursuant to the terms of the Act....

Pepsi also argues that, because it disputes the *fact* of the 1984 complete withdrawal determination, not just the resulting assessment, it should somehow be excused from the statutory mandates regarding interim payments and arbitration of withdrawal liability disputes. This assertion conflicts with the explicit statutory scheme provided by the MPPAA. Section 1401 specifically states that an employer dissatisfied with all the Fund's determinations under Title IV of the Act must proceed, at least initially, to arbitration. The fact that an employer contests the existence of a withdrawal, and not merely the calculations, has no bearing on this requirement. *See Robbins v. McNicholas Transportation Co.*, No. 84 C 6821, slip op. at 3 (N.D.Ill. June 6, 1985) [Available on WESTLAW, DCTU database] (Under Section 1399, the trustees have a right to demand payment of withdrawal liability even though the employer contests the validity of the trustees' position that a withdrawal has occurred); *I.A.M. National Pension Fund Benefit Plan A v. Dravo Corp.*, No. 85–0778, slip op. at 5, — F.Supp. —, — (D.D.C. October 23, 1985) (factual dispute as to whether the employer has withdrawn is

the very issue to be resolved by the arbitrator); *Combs v. Manor Mines, Inc.*, 5 E.B.C. 1475, 1478 (D.D.C.1984) (employer must pay interim benefits even if it disputes the *fact* of liability). If necessary, the Fund (possessing very substantial assets) can repay excess payments received from Pepsi. 29 U.S.C. § 1401(d).

The decision in *Marvin Hayes Lines, Inc. v. Central States, Southeast and Southwest Areas Pension Fund*, No. 3–84–0906, slip op. (M.D.Tenn. July 29, 1985), cited in support of Pepsi's position, is not [Available on WESTLAW, DCTU database], applicable to this case. In that case, the Fund moved for a preliminary injunction ordering the employer to make his scheduled monthly payments. The court employed the traditional test for granting injunctive relief in order to determine whether to grant the request for interim payments.[11] It concluded that, although the statute appears to favor granting an injunction for interim payments, the facts of that case compelled the opposite conclusion, because the trustees' determination of the employer's withdrawal date was "unreasonable *and* clearly erroneous." slip op. at 7 (emphasis in original). In this case, this court has made no similar finding.

The *Marvin Hayes* court declared that no interim payments would be ordered because the trustees' determination of a withdrawal was "clearly erroneous." The court reached this conclusion despite the fact that the employer and the Fund had initiated arbitration to resolve the very same issue. However, the issue regarding *whether* an employer has withdrawn is not one committed to the courts to resolve in the first instance. Congress has clearly instructed the parties to submit this issue, at least initially, to an arbitrator. Absent compelling reasons (which are not present here), this court will not negate the arbitration requirements explicitly set forth in the MPPAA. Pepsi must follow the statutory framework provided in the MPPAA for challenging its withdrawal liability assessment. In the meantime, it must commence

---

11. "[W]hether the moving party has shown a strong likelihood of success on the merits and irreparable injury; whether the issuance of a preliminary injunction would cause substantial harm to others; and where the public interest lies." *Marvin Hayes, supra*, slip op. at 4.

payment of its monthly liability assessments. *Thomas v. Southland Corp.*, 603 F.Supp. 1088, 1092 (N.D.Ill.1985).[12]

■ Similarly, Pepsi cannot defeat an order of interim payments based on the fact that the assessment is greater than its previous annual contributions to the Fund. In *Connolly v. PBGC*, —— U.S. ——, 106 S.Ct. 1018, 1026, 89 L.Ed.2d 166 (1986), the Supreme Court implicitly acknowledged that withdrawal liability might not be strictly proportional to the employer's past contributions. If an employer's withdrawal liability is greater than its previous contributions, this may be due in part to the effect of employer withdrawals on the Fund's overall contribution base. *See Central States, Southeast and Southwest Areas Pension Fund v. Bellmont Trucking Co.*, 788 F.2d 428, 432 (7th Cir. 1986).

Finally, although Pepsi cites cases in which the court denied an order of interim payments because of the economic hardship the order might place on the employer, the Pepsi group has never argued that this assessment constitutes an unlawful percentage of its own net worth.[13] In fact, Pepsi has emphasized its financial stability throughout the course of this litigation. *See Central States* Mem. in Opp. to Motion to Compel Payments at 12 n. 15. Moreover, Pepsi has not claimed that the withdrawal payments are disproportionate to the unfunded vested liability of Pepsi employees. *See Connolly v. PBGC*, —— U.S. ——, 106 S.Ct. 1018, 1032, 89 L.Ed.2d 166 (1986) (O'Connor, J., concurring) (noting possible unfairness of imposing liability on an employer "for substantial sums even though the employer's contributions plus its allocable share of plan earnings *exceed* the present value of all benefits accrued by its employees."). In short, Pepsi has presented this court with none of the equitable considerations which have compelled other courts to refuse a request for interim payments of an employer's withdrawal liability.

### Conclusion

"The denial of [a] claim to interim withdrawal benefits is a serious one. Congress believed it was important to insure that the flow of employer withdrawal liability payments was not delayed by an employer disputing liability." *Pantry Pride, Inc. v. Retail Clerks Tri-State Pension Fund*, 747 F.2d 169, 171 (3d Cir.1984). The court finds that § 1399(c)(2) requires the Pepsi defendants to make interim payments (including interest) to the Fund consistent with the Fund's initial assessment schedules. "To refuse [this request] for interim payments would frustrate the intent of Congress in enacting the legislation to ensure the integrity of the Pension Fund pending the outcome of the dispute between the trustees and the employer." *Robbins v. McNicholas Transportation Co.*, No. 84 C 6821, slip op. at 5 (N.D.Ill. June 6, 1985) [Available on WESTLAW, DCTU database]. This order is retroactive to the defendants' receipt of each original notice and assessment of liability. The Trustees are hereby instructed to complete the reassessment ordered in this court's May 8, 1986 opinion as quickly as possible, and to amend the initial schedules where appropriate to reflect any change in the original withdrawal liability assessments and interim payment schedule.

**12.** Both sides of this litigation apparently interpreted this court's comments at the October 12, 1984 hearing to indicate that interim payments could not be ordered until all of Pepsi's defenses and counterclaims were resolved. The court has reviewed the transcript of that hearing, and finds that the present order granting interim payments is not inconsistent with the preliminary views expressed therein.

**13.** For instance, in *Victor Construction Co. v. Construction Laborers Pension Trust*, 2 E.B.C. 2467 (C.D.Cal.1982), the Trust assessed withdrawal liability which equalled 26.6% of the employer's net worth. The court declined to award interim payments, noting that immediate payment of this amount could precipitate a bankruptcy because it would significantly impair the employer's ability to continue his business. *Id.* at 2468–69. Pepsi has made no similar claim regarding the effect of the Fund's assessments on the entire group's overall business operations. In any event, the court notes that the Supreme Court recently upheld the constitutionality of an assessment which comprised 25% of the employer's net worth in *Connolly v. PBGC*, —— U.S. ——, 106 S.Ct. 1018, 1025, 89 L.Ed.2d 166 (1986).

685

Therefore, this Court orders the defendants to make the interim payments hereunder on and after July 1, 1986.